MILLER ᴇᴛ ᴀʟ. *v.* ABRAHAMS

[No. 320, September Term, 1964.]

264

*Decided June 23, 1965.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*Allan J. Malester,* with whom were *Robert L. Sullivan, Jr.,* and *Sullivan & Pittler* on the brief, for the appellants.

*W. Lee Harrison* for the appellee.

PRESCOTT, C. J., delivered the majority opinion of the Court. BARNES, J., dissents. Dissenting opinion reported at page 275, *infra.*

The question involved in this appeal is a narrow one, and few of the facts are disputed. The question is whether the County Council of Baltimore County committed a basic mistake when it adopted, on November 15, 1962, the comprehensive Western Area Zoning Map for the 3rd District of Baltimore County, on which the subject property was classified as R-6 (residential, 1 and 2 family).

Some two months after the adoption of the map, appellee petitioned the Zoning Commissioner for a reclassification of the 5.2 acre parcel, the subject property, to B-L (business-local). This request was denied. An appeal was taken to the Board of Appeals (Board), and, after a hearing on April 8, 1964, with two of its three members sitting, the Board reversed the action of the Commissioner. An appeal was taken to the Circuit Court, which affirmed the Board's ruling, and the appeal to this Court followed.

The appellee argues that he has presented a classic example of original mistake. In his attempt to sustain this argument and meet the heavy burden placed upon him, the record before us, summarized, shows the following. The Commissioner denied the request because "from the facts presented * * *, the only real point the petitioner has was that there was a *possibility of error* [italics ours]" in the map, and this possibility of error was that the Council might have been under the impression that the Planning Board had recommended R-6 zoning, when the map submitted by the Planning Board to the Council showed a recommendation of B-L zoning.

The Board, on the other hand, felt that petitioner had shown "a clear case of a mistake." The board laid great stress upon Item 21 of the Council's agenda at its meeting on October 16, 1961, which we will now consider as appellee apparently deems it his "ace in the hole." This Item 21 of the Council's agenda of that day, after a description of the subject property, reads: "Mrs. Boone [a member of the Council], seconded by Mr. Dignan, moved to accept the Planning Board's recommendation of R-6 zoning. Carried unanimously." It is undisputed that the original preliminary proposed map submitted to the Council by the Planning Board showed applicant's property as recommended for B-L zoning. Appellee argues that this establishes an obvious mistake on the part of the Council when it zoned the subject property R-6, and very substantial weight was given the above Item, both by the Board of Appeals and the trial court.

The argument is not sustainable for, at least, two reasons. First, we are not dealing with a matter of correcting a possible clerical error, or establishing the motivating cause for the Council's action, but with a matter of whether or not the Council made a basic and actual "mistake," as that term is used in zoning law, *at the time* when it classified the property as R-6. Therefore, no matter what reason prompted the Council's action, it was still incumbent upon the petitioner, if he were to be successful, to meet the heavy burden of establishing such a mistake in the classification of his property.

Secondly, the argument takes Item 21 alone from the agenda, and ignores other and very important portions of the Council's minutes, and then attempts to construe the Item out of context. The minutes show the meeting was a special one to consider the "Western Planning Area Map," and no one was permitted in attendance, except the members of the Council and its advisers. Under the heading *"Amendments* [italics added] to the Western Planning Aera Zoning Map," we find the following:

"The Chairman recognized Mrs. Boone, who presented to the Council a proposed schedule of changes in the Second District of the Western Planning Area

Map. Mrs. Boone explained these changes item by item with comments by Mr. Malcolm Dill, Director of Planning and Zoning; Mr. Leslie H. Graef, assistant to Mr. Dill; and Mr. Robert Gould, also assistant to Mr. Dill. After further discussion, each individual change was voted on with the following results:"

There then followed 22 separate motions by Mrs. Boone, which were the only motions made, relative to 22 properties on the map, and all motions carried; some granted requested changes from the map, and others denied such changes. There is nothing in the record to show what authority, if any, Mr. Dill, Director of Planning and Zoning, and his two assistants had from the Planning Board to make suggested changes from the map in its behalf (we do not intimate that any such authority was necessary in order to validate the Council's action). But, with the minutes showing that the purpose of the meeting was to make possible "amendments" to the Area Map, that "Mrs. Boone explained these changes item by item with comments by Mr. Malcolm Dill," and two of his assistants, and "after further discussion, each individual change was voted on" (without further explanation), we think, the likelihood that the Council was acting under the misapprehension that it was adopting the Planning Board's recommendation on the preliminary map relative to the subject property is quite remote. And, as we indicated above, even if the Council did act under such a misapprehension, this, alone, would be insufficient to establish a basic mistake in the classification.

After reciting Item 21 from the Council's minutes, the Board assigned (in substance) as its reasons for believing that a mistake had been made the following: "The original plat of the property prepared for sales purposes indicates this tract of land as 'proposed shopping center,' " and these "plats were used in the sale of lots to prospective purchasers"; "there is in evidence newspaper advertising presented by the [former owners of the property] which clearly states 'proposed shopping center on site' "; Mr. Gavrelis, Acting Planning Director, indicated that his department and the Planning Board were aware of this planned use and he had recommended to the Council that the

property be zoned B-L; there was testimony before the Board that Old Court Road *will be* relocated "so as to eliminate a sharp right angle turn *near* this property," and another road *will be* extended. "There was testimony to the effect" that there *is* a definite need for a small shopping center in this area; a witness from the County Roads Department testified "that the builder will be required to dedicate the land and pave [Old Court Road] referred to above * * *"; "there was testimony" that the rezoning of the subject property would not adversely affect the surrounding residential property; and the protestants' testimony consisted mostly of expressed fears as to what might happen in the future in the operation of the shopping center. (All italics ours.)

We deem it desirable to analyze this "opinion" of the Board before proceeding further with the summary of the testimony. It must be remembered that we are considering an alleged original mistake in zoning, not an alleged change in the neighborhood. Hence, any changes in the neighborhood and the existing situation surrounding the subject property are significant only to the extent that they were reasonably foreseeable and tend toward establishing original error. The opinion has little in it to disclose the situation as it existed when the Council acted—either in November of 1962, when it formally adopted the map, or on October 16, 1961, when it approved a resolution that the property be zoned R-6. (A delay in the formal adoption was occasioned by litigation and/or a referendum neither of which has any relevance to the case at bar.) Certainly no great weight can rightfully be afforded to a sales-promotion advertisement by an owner designating the property as a "proposed shopping center." The recommendation of the Planning Board of B-L zoning was a proper factor to be considered on the question of mistake, but it, alone, unless supported by clear and sufficient reasons, was not controlling. The minutes of the Planning Board assign as that Board's reason for recommending B-L zoning the following: "The B-L commercial zoning was reaffirmed by the Board because the proposed neighborhood center can be accommodated in the subdivision plans for the immediate vicinity without interfering with residential properties or detracting from their values." The record

discloses that the Council did not accept the recommendation of the Planning Board relative to applicant's property, and it acted in a similar manner on other recommendations, at times changing the locations of recommended commercial and residential zonings. The above reason given by the Planning Board, without more, can scarcely be seriously urged as a clear and sufficient showing of a mistake by the Council.

In regard to the roads, the undisputed testimony (most of which was given by applicant's witnesses) shows that, if the subject property be developed as a shopping center, the roads *thereon* will be required to be constructed and mostly at the developer's expense, but the construction and widening of the roads leading up to the property will depend, in large measure, upon when the owners of abutting properties along the roads develop their properties. The probative value of proposed roads, which are still in the "proposed" stage some $1\frac{1}{2}$ to $2\frac{1}{2}$ years after the Council's action (depending upon whether the time be calculated from the time of the adoption of its resolution or the map) is not very weighty in establishing original error. It will be noted that the Board made no actual findings in regard to a need for a shopping center at the location of the subject property, or, if erected, how it will affect adjoining and nearby properties. There was conflicting testimony on both issues. The opinion merely states "there was testimony" to a certain effect, without making findings one way or the other; however, we do not consider this of major importance, for neither issue (although both are factors to be considered if they were reasonably foreseeable) bears very heavily in this case upon a mistake at the time of the zoning. The uncontroverted testimony shows several shopping centers located in the area, some as close as 1.3 miles from the applicant's parcel.

We continue with the testimony. Witnesses testified as to the former owners' advertisement showing the subject property as a location for a "proposed" shopping center, which they realized was contingent upon proper zoning. Mr. Gavrelis, Acting Director of Planning and Zoning, was called by the applicant. Gavrelis has been associated with the Office of Planning in Baltimore County for years, and has, more or less, grown up with planning and zoning in that county. He had

been familiar with the subject property and the surrounding area for years. He helped prepare the map, which was submitted to the Council recommending that applicant's property be zoned B-L. This recommendation, as well as others, was rejected by the Council, and when the map was finally adopted, the Council had "rejected certain residential classifications, and placed within the area zoned * * * additional B-L classification, over and above that which had been recommended * * *." When asked point blank if he had "an opinion as to the correctness of the zoning applied to this property, since the adoption of the map," he replied, "No." He also stated that commercial development had occurred since the adoption of the map, and said, "what this means in terms of at least consumers' satisfaction, with the shopping opportunity available in the area, I don't know."

Gilbert Benson of the Bureau of Engineering testified that the existing right of way on that portion of Old Court Road in front of the property is 20', but the proposed road anticipates a 42' paving on a 60' right of way. The time of the widening of the approaching roads would depend upon when the abutting property owners develop their respective properties.

There was testimony that adequate water and sewer facilities *are* available to serve the site. The time when they became available is not stated.

Mr. Bernard Willemain was called by the applicant. Willemain is a man of long experience in the planning and zoning field, and is familiar with planning and zoning in Baltimore County. He stated that the recommended zoning of the subject property as B-L was "certainly controversial and unpopular at the time of the public hearing" held by the Planning Board, and "admittedly it is always difficult to locate these small shopping areas * * * because of the possible ramifications of the commercial zoning itself." He further stated that he attended the one (public) hearing the Council held upon the map, and the Council was "given full information on the property * * * and the recommendations * * * by the Planning office * * *." (It will be noted that this testimony tends to weaken applicant's claim that the Council was acting under a misapprehension when it adopted the map.) At one point in his testimony,

Willemain said, "the case before the Board is one of possible error on the part of the County Council." At another point, he stated that, in his opinion, "the present R-6 zoning of the property is in error and the proper zoning for the property is the B-L classification requested by the petitioner today." He then gave his reasons: he had researched the zoning and planning files and had visited, after his employment by the petitioner, the property five or six times; he felt the subject property held a "strategic" position for a shopping center due to its location on Old Court Road and the property's relation to "proposed" new roads and "proposed" extensions and widenings of old ones; he felt the distances to existing shopping centers, the nearest being 1.3 miles away, inconvenienced the public; and he thought enough was known of the proposed shopping center to show that its construction would not affect adversely the nearby properties. Willemain was impressed by Item 21 of the minutes of the Council at the time it classified the property, which we considered above, as showing a "mistake" had been made.

Mr. Frederick P. Klaus, a real estate consultant and appraiser, was also called by the applicant, but few of the questions propounded to him bore upon the question of original mistake. The substance of his testimony was that he agreed with Mr. Willemain.

The protestants consisted of nearby property owners, the president of a citizens' association, and the pastor of a local church. They saw no need for the proposed change, as present shopping facilities were adequate; there was only one subdivision that would not be just as close to other shopping centers as the subject property; the value of adjacent and nearby residential properties would be depreciated, and the residents annoyed by the lights, trash, debris, etc. caused by the erection of a shopping center; it would be opposite the Junior High School and close to a church (costing $150,000) which conducts a Sunday school, and there would be a resultant danger to the children crossing Old Court Road; the nearby roads were still old and narrow; and, essentially, the neighborhood was still a rural and residential one. And one property owner testified that he, too, attended the (public) hearing held by the Coun-

cil, and at this meeting, attending persons by statements and maps and overlays, fully informed the Council of the recommendation of the Planning Board relative to the classification of applicant's property.

There is no doubt, and it seems to be conceded, that the County Council is the public authority in Baltimore County empowered to zone and rezone. Sec. 34-1, Baltimore County Code (1958). And it is also true that the Planning Board's adoption of a master plan for an area constitutes a recommendation to the Council as to what that Board considers proper zoning classifications for the properties on the map, but the Council may or may not adopt the recommendations so made. Sec. 23-8, Baltimore County Code (1963 Supp.) ; cf. *Reese v. Mandel*, 224 Md. 121. This Court has repeatedly stated that classifications contained in a comprehensive zoning map adopted by the proper authority carry a strong presumption of validity. *MacDonald v. Board of County Comm'rs*, 238 Md. 549; *Greenblatt v. Toney Schloss*, 235 Md. 9; *Shadynook Imp. Assn. v. Molloy*, 232 Md. 265; *Trustees v. Baltimore County*, 221 Md. 550. And the burden of overcoming this presumption of validity is a heavy one. *Hewitt v. County Comm'rs*, 220 Md. 48; *Reese v. Mandel, supra*. Cf. *Pahl v. County Bd. of Appeals*, 237 Md. 294.

Having in mind these principles of law, we proceed to examine the evidence to see if the applicant has met the heavy burden of establishing original error. We pointed out above that Item 21 does not render great assistance to the applicant in overcoming this burden, for the evidence taken as a whole, including the testimony of Willemain and the protesting witness to the effect that the Council was fully apprised of the Planning Board's recommendation, fails to show, clearly and satisfactorily, that the Council was, in fact, laboring under a misunderstanding; and, even if it were, the applicant, in order to prevail must show the adopted classification was a mistake, as that term is used in zoning law. We shall not repeat all that we said above in regard to the Board's opinion, or the reason assigned by the Planning Board for its action, but we do restate that there is nothing in either of controlling significance.

This brings us to a consideration of the testimony of Messrs.

Gavrelis and Willemain. These gentlemen are well-recognized experts in the field of planning and zoning. However, the prevailing general rule, almost universally followed, is that an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant. Cf. *State, etc. v. Critzer,* 230 Md. 286. We must, therefore, examine the reasons given by the above experts.

Gavrelis, when asked if he had an opinion as to whether or not error had been committed in the classification of the subject property by the adoption of the map, replied, "No." Surely, if reasons given by an expert are insufficient grounds for the expert to formulate an opinion, they can scarcely be soundly held to be clear and satisfactory evidence to overcome the heavy burden created by the presumptive validity, mentioned above; so we proceed to Willemain's reasons. When carefully scrutinized, the crux of his grounds for believing that a mistake had been made was the "strategic" location of the property in relation to "proposed" new roads and "proposed" improvements to old ones, supplemented by the weight he placed upon Item 21, and his belief of no adverse effect upon other properties and that the location of existing shopping centers inconvenienced the public in going to and from them; although, at the same time, stating that it is always difficult to locate these small shopping areas because of the possible ramifications of the commercial zoning itself. We do not think, that the reasons given by these experts were sufficient to make the issue of mistake (and bear in mind that we are only dealing with that question in this case) fairly debatable.

We are cited the case of *Jobar Corp. v. Rodgers Forge,* 236 Md. 106, in support of applicant's position. That case involved questions of both mistake and change in neighborhood. We limit our present discussion to the issue of mistake. The same two experts testified in that case as in the instant one, and its citation here affords an opportunity to point up the holding of the majority in *Rodgers Forge,* where the Court was divided 4 to 3.

The majority in that case took considerable trouble to set forth in quite some detail the reasons assigned by Willemain to support his opinion that an error had been committed (these

reasons are stated in 236 Md. pp. 116-118 and consume about 2 pages of the printed report). These reasons set forth, at some length, the situation and condition of the subject property in that case and the surrounding properties *at the time* of the adoption of the map involved therein. They then went on to state the needs and potentials of the area and the projects that were "reasonably probable of fruition in the foreseeable future" (*Trustees v. Baltimore County, supra*) which, in Willemain's opinion, the County Commissioners (now the County Council) failed to take into account, when the map was adopted. The reasons were supported, in the reasoning of a majority of the Court, by exhibits and other evidence. The Board of Appeals, after a consideration of all of the evidence, accepted the expert's opinion and stated that a mistake had been made, and this Court upheld the action of the Board of Appeals, on the ground that the issue was, at least, fairly debatable. But in upholding the said Board's right to accept Willemain's opinion, we were careful to point out that if "it [the Board] decided to accept his opinion *for the reasons given by him,* we cannot, under our previous holdings, reverse the Board's action, *in the absence of a showing that the acceptance of the opinion was arbitrary and capricious in a legal sense."* In other words, the reasons presented by an expert to support his opinion cannot be immaterial or frivolous in character, but must be sound and substantial ones. In the case at bar, Willemain did not state the situation of the critical area and the conditions surrounding it at the time of the adoption of the map, including the projects, improvements and developments which were reasonably probable of fruition in the foreseeable future. Nor did he state anything of a substantial nature which should have been reasonably foreseen by the Council, but was ignored by it. From the above, it is seen that *Jobar Corp.* is easily and readily distinguished from the instant case.

We do not deem it is necessary to discuss further the evidence relative to "proposed" plans relative to roads.

We have said several times above, in considering the testimony relative to the individual factors involved, that the evidence relative to that individual factor, alone, was insufficient to make the issue of mistake fairly debatable. Nor are we able

to conclude that an examination of the evidence pertaining to all of the factors considered as a whole raises the issue into the realm of fair debatability. Our conclusion is metaphorically illustrated by the simple arithmetical computation that zero plus any number of additional zeros still equals zero. As the evidence before the Board was too thin to make the issue of mistake fairly debatable, it rendered its action arbitrary and capricious in a legal sense [1]; consequently the court's order affirming the Board must be reversed.

> *Order reversed, and case remanded for the entry of an order in accordance with this opinion; appellee to pay the costs in this Court and below.*

BARNES, J., filed the following dissenting opinion.

The majority opinion illustrates to my mind the essential unsoundness of the "mistake in original zoning-change in physical conditions" rule which we have applied in rezoning cases since the decision of this Court in *Wakefield v. Kraft,* 202 Md. 136, 96 A. 2d 27 (1953). I pointed out, at some length, in Part III of my dissenting opinion in *MacDonald v. Board of County Commissioners of Prince George's County,* 238 Md. 549 at page 557, 576-601, 210 A. 2d 325, 329, the unfortunate entry of this doctrine into the Maryland law and its rapid and unhealthy growth. The *MacDonald* case, however, involved the "change in physical conditions" portion of the rule; the case at bar involves "mistake in original zoning", the remaining part of the rule. The comments in Part III of the dissenting opinion in *MacDonald* are generally applicable in this case, and need not be repeated here. There are additional observations with particular reference to the "mistake" portion of the rule which should be made.

In the majority opinion it is stated that for the petitioner to prevail, he must "meet the heavy burden placed upon him"

---

1. The gentlemen of the Board who sat in this case are both of high standing and reputation, and we make no intimation that either of them, intentionally, was arbitrary or capricious.

to show the original mistake. In *MacDonald* the majority stated that the rezoning could only be sustained when there is "strong evidence of mistake" in the original zoning or when there is "a substantial change in conditions" in the neighborhood. In some of our prior cases we have indicated that there is a strong presumption of the reasonableness of a zoning ordinance but this presumption of reasonableness does not apply with the same weight or "with as great force" to a rezoning ordinance. See *Mettee v. County Commissioners of Howard County,* 212 Md. 357, 366, 129 A. 2d 136, 141 (1957) and cases cited in that opinion.

As all of the cases agree that both zoning and rezoning ordinances involve the exercise of legislative power, why is it that the exercise of legislative power at a later time does not have at least equal force or an equal presumption of validity as does the prior exercise of legislative power? Apart from rezoning legislation, we have consistently, vigorously and, to my mind, quite properly held that one legislative body may not prevent contrary action by the legislative body acting at a later date, however emphatically it attempts to do this. *Montgomery County v. Bigelow,* 196 Md. 413, 423, 77 A. 2d 164 (1950); see also *State v. Fisher,* 204 Md. 307, 315, 104 A. 2d 403 (1954); *Prince George's County v. Donohoe,* 220 Md. 362, 367, 152 A. 2d 555 (1959). In my opinion, there should be no "heavy burden" upon the petitioner or the requirement of "strong evidence of mistake" in the original zoning. As stated by the Court in *Bartlett v. Middletown Township,* 51 N. J. Super. 261, quoted in 1 Rathkopf, *The Law of Zoning and Planning,* 27-14 (n. 22):

> "* * * the presumption of validity attending the original ordinance must give way to the presumption of the correctness of the amendatory ordinance. The Legislature not only conferred upon municipalities the power to adopt zoning ordinances but also the power to amend, change, modify or repeal them * * *."

I fear that our present rule is justly subject to the observation by Rathkopf when he stated:

> "The Maryland rule would appear to be a limita-

tion upon the power of the legislative body to rezone rather than a strict rule of presumption." (Id., p. 27-16).

We should return to more orthodox doctrine. If we are not able to do this because of the doctrine of *stare decisis,* I again suggest, with great respect, as I did in the dissent in *MacDonald,* that the Legislative Council and ultimately the General Assembly give serious thought to a change of the present rule by appropriate legislation.

In my opinion the "mistake in original zoning" portion of this rule—assuming *arguendo* its validity—has been misapplied by the majority in the case at bar. While the facts are rather fully stated in the majority opinion, they need some further amplification.

Mr. Gavrelis, the Deputy Director of Planning for Baltimore County for six years and the Acting Director of the Office of Planning and Zoning, was with the Department of Planning in 1955 or 1956 when the Department of Planning originally processed the subdivision plans for the 5.2 acre parcel involved in this case. The prior studies culminated with the recommendation in connection with the adoption of the Western Planning Area Zoning Map. It is undisputed that the Department of Planning recommended to the Planning Board that the subject property be zoned B-L (Business-Local). Mr. Gavrelis gave in some detail the factors which led the Planning staff to recommend that the subject property be given commercial zoning. These factors were:

1. The fact that Old Court Road was proposed to be relocated so as to eliminate the 90-degree turn at the present intersection of Old Court Road with Marriott's Lane.

2. The plans of the Planning staff called for the ultimate extension of Rolling Road northerly from Liberty Road across Scott's Level Branch to intersect Old Court Road as relocated opposite the middle of the subject tract.

3. The subdivision had been developed so that the back lots adjoining the commercial area had lot depths greater than those typical in an R-6 development.

4. The concept of a small shopping area for neighborhood

service areas seemed logical to the Planning staff as the subject property was approximately halfway between two commercial areas, and there were no other shopping facilities for this newly-developed area other than at Reisterstown Road or at Liberty Road. The Planning staff felt there was a need, based on its general studies, and that the small commercial area on the subject property was appropriate.

It is uncontradicted that the Department of Planning prior to 1960, and as early as 1956, approved preliminary site plans for the subject property indicating a proposed shopping center on this site.

It is also undisputed that the B-L zoning for the subject property as recommended was placed on the Master Plan and remains at the present time on the Master Plan.

On the documents of both the Department of Planning and the Planning Board when the Planning Board presented its recommendations to the County Council on October 16, 1961, it clearly appeared that the Planning Board's *recommendation* was for *B-L zoning* for the subject property and *was not for R-6 zoning*. There was no other recommendation by the Planning Board. It is entirely clear from the testimony of Mr. Gavrelis that there was *absolutely no basis* for any other recommendation. The motion made at the meeting of the County Council on October 16, 1961 was "to *accept the Planning Board's recommendation* of R-6 zoning" and this motion "carried unanimously." (Emphasis supplied.) The intent of the County Council was clearly to accept the Planning Board's recommendation. The *only* recommendation was for B-L zoning. This is undisputed. It follows that the inclusion of "R-6" zoning, rather than the recommended "B-L" was an error. Mr. Gavrelis leaves little doubt about this. When asked: "If Minute No. 21 is an accurate reflection of what transpired in the County Council on that date, do you have an opinion as to whether or not the Council was in error when they put R-6 zoning on this property?", Mr. Gavrelis replied, "If the minutes fairly represent the Council's understanding of this situation, that in fact the Planning Board had recommended R-6 rather than B-L, then I would say something was in error." Whatever the degree of the burden upon the petitioner to es-

tablish an original mistake in zoning—be it light, medium, or heavy—in my opinion, he has met it. In any event, the lower court could most certainly have found—as it did—that the matter was "fairly debatable" and the determination of the County Board of Appeals that a mistake had been made, should be sustained.

The majority opinion indicates that Item 21 does not show a mistake in original zoning because (1) the question is "whether or not the Council made a basic and actual 'mistake' as that term is used in zoning law, *at the time* when it classified the property R-6" and (2) the other items on the agenda of the County Council's meeting of October 16, 1961 with the explanation by Mrs. Boone and with comments by Mr. Dill, Director of Planning and Zoning, Mr. Graef and Mr. Gould, assistants to Mr. Dill, in which certain requested changes were granted or denied, indicate that the "likelihood that the Council was acting under the misapprehension that it was adopting the Planning Board's recommendation * * * is quite remote." These reasons do not appeal to me as weakening the showing by Item 21 that a mistake was made. As indicated in the majority opinion, the meeting of the County Council of October 16, 1961 was not open to the public and no persons other than the members of the Council and the Planning Officials were present. The B-L zoning recommended to the Planning Board by the Planning Staff (Mr. Dill, Mr. Graef and Mr. Gould were part of that staff) and by the Board to the Council was the result of the studies and past action by the Planning staff. The B-L zoning was at that time and still is on the Master Plan. There is no suggestion in the Minutes of the Council that any one presented any evidence or arguments against the recommended B-L zoning. Under the circumstances, it is almost inconceivable that any such testimony or arguments were presented. Item 21 indicates the contrary. It states that the Council unanimously *accepted* the Planning Board's recommendation. It would seem apparent that if the Council had not intended the recommendation, it would have stated this and the motion would have been "* * * motion to reject the recommendation of the Planning Board for B-L zoning and in lieu thereof, to establish R-6 zoning," or language to that effect.

No reasons or facts justifying R-6 zoning appear in the Minutes of the Council. All of the evidence is to the contrary. It seems to me that it might be assumed that the Council acted reasonably and in accordance with the only evidence apparently before it and in fact intended to do what it said it intended to do, i.e., "accept the Planning Board's recommendation." The inclusion of R-6 zoning, which was *not recommended* by the Planning Board was a mistake in original zoning both "actual" and "basic" in my opinion. At least the Board of Appeals could so find (as it did) ; and the matter was fairly debatable, as Judge Jenifer decided.

But there are other facts to be considered. The Planning staff had approved the preliminary site plans for the subject property prior to 1961. The signs for sales promotion placed on the subject property prior to 1961 indicated that a shopping center would be erected on the subject property. The advertising for sales of lots indicated the same thing. Two of the property owners who testified before the Council in opposition at the hearing on April 8, 1964 before the Board of Appeals, which granted the re-classification to B-L zoning, admitted that they knew of this proposed use when they purchased their property. In short, the community was put on notice before the purchase of lots of the erection of the proposed shopping center.

Bernard M. Willemain, an expert with unusually high qualifications[1] testified that after having made a study of the subject property, he had an opinion "as to the correctness of the R-6 zoning imposed upon this property by the adoption of the map." This opinion was "that the present R-6 zoning of the property is in error and that the proper zoning for the property is the B-L classification requested by the petitioner today."

---

1. B.S. in Civil Engineering and Landscape Architecture, University of Massachusetts; Master of City Planning, Massachusetts Institute of Technology; Deputy Director of the Baltimore County Planning Commission for 5 years; drafted the present Baltimore County Zoning Code; he has done consultative work in three states and the District of Columbia; his clients have included the State Roads Commission of Maryland, Baltimore and Montgomery Counties, City of College Park, Baltimore Urban Renewal Agency, the Baltimore Transit Company, and others.

In giving his reasons for his opinion, Mr. Willemain indicated that:

1. He visited the subject property five or six times after employment to testify as an expert.

2. He reviewed the zoning and planning files to add to his personal knowledge of the history of the particular proposal and the specifics of the property itself.

3. He was present at the public hearings.

4. He obtained copies of the published reports accompanying the Planning Commission's recommendations to the County Council; he had read the relevant minutes.

5. Before the map was adopted, he discussed the land uses on the paper prepared by the Planning staff before they were presented to the Board.

6. He considered the contemplated changes in the various highways and the proposed engineering plans as well as the various factors of location.

Mr. Willemain also indicated that there was a need for the proposed local shopping center and that the B-L zoning would have no adverse effect on any of the adjoining properties or lead to further reclassification in the immediate neighborhood.

William B. Purdum, a consulting engineer, testified that he prepared the layout for the 5.2 acre parcel, that sanitary facilities and water were available and that in view of the location of the subject property, its triangular shape and small size, he did not think "it would be economically feasible to develop in detached homes." He also testified that there would be no traffic hazard resulting from the reclassification to B-L zoning.

In the majority opinion it is suggested that part of the testimony mentioned above was presented in the present tense rather than in the past tense, the inference being that this testimony is of limited value in determining whether there has been a mistake in the original zoning. I do not think this inference is justified in that, in my opinion, the basic factual situation in regard to the subject property and the surrounding area was substantially the same at the time the testimony was given at the reclassification hearing as it was on October 16, 1961 and when the zoning map was adopted by the County Council, even though the issue in regard to "change in the character of the

neighborhood" was not before the Zoning Commissioner in this application because the two year period from the date of the adoption of the zoning map provided for in Section 500.3 b of the Baltimore County Zoning Regulations had not expired prior to the filing of the application.

These additional facts, to my mind emphasize the actual and basic mistake in the original zoning. The Planning staff and the Planning Board found that there was a community need for this local shopping center prior to the original zoning. The same need continues to exist. B-L zoning was recommended to satisfy this community need. The satisfaction of this need will not injure the surrounding properties or bring in new reclassifications. The R-6 zoning did not satisfy this community need in 1961 and does not satisfy it now. The R-6 zoning will result in an uneconomic use of the subject property. This was the situation in 1961. It is apparent to me that the Council, without evidence, without argument and against the recommendation of the Planning Board and the Planning staff made an actual and basic "mistake" in zoning the subject property "R-6" instead "B-L".

The majority indicates that the case at bar is readily distinguishable from the holding in *Jobar Corp. v. Rodgers Forge Community Ass'n.*, 236 Md. 106, 202 A. 2d 612 (1964). In my opinion, the case at bar is a far stronger case for a holding that there was a mistake in original zoning than was presented by the facts in *Jobar*. I cannot agree that "Willemain did not state the situation of the critical area and the conditions surrounding it at the time of the adoption of the map, including the projects, improvements and developments which were reasonably probable of fruition in the foreseeable future." Not only did Mr. Willemain indicate his consideration of the studies of the Planning staff prior to 1961 which included these factors, but the testimony of the other witnesses presented these matters as well. It seems clear to me that the reclassification to B-L zoning by the Board of Appeals was properly sustained and that Judge Jenifer's order should be affirmed.