# NOTTINGHAM VILLAGE, INC., ET AL. *v.* BALTIMORE COUNTY, MARYLAND

[No. 14 (Adv.), September Term, 1972.]

*Decided July 6, 1972.*

*Motion for rehearing filed August 3, 1972; denied September 11, 1972.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ., and RALPH W. POWERS, Chief Judge of the Seventh Judicial Circuit, specially assigned.

*Richard A. Reid,* with whom were *Royston, Mueller, Thomas & McLean* on the brief, for Nottingham Village, Inc., one of appellants. *Lewis A. Noonberg,* with whom were *Piper & Marbury* on the brief, for The Rouse Company, other appellant.

*Harry S. Shapiro, Chief Assistant County Solicitor,*

with whom were *R. Bruce Alderman, County Solicitor,* and *Thomas J. Aversa, Jr., Assistant County Solicitor,* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

Nottingham Village, Inc. (Nottingham) and The Rouse Company (Rouse) which are respectively the owner of a 930 acre tract located in Baltimore County (the County) and the lessee of a 150 acre parcel of the same tract, believing themselves aggrieved by a comprehensive Zoning Map adopted by the County Council on 24 March 1971, filed a bill of complaint in the County's circuit court seeking declaratory and injunctive relief. From a decree dismissing the bill of complaint, Nottingham and Rouse have appealed.

Both the facts of the case and the issues presented are enormously complex. The crux of the controversy, however, lies in the fact that the Nottingham tract, zoned R-6 (detached residences, minimum lot size 6,000 square feet) except for 36 acres zoned RA (residential, apartment) was rezoned DR 5.5 (density residential, 5.5 dwelling units per acre) by the comprehensive rezoning adopted in 1971 by the County Council. Nottingham had sought RA zoning for 185 acres; BR (business, roadside) for 20 acres; BM (business, major) for 140 acres with a CT district (commercial, town-center core) superimposed thereon (BM-CT) and R-6 for the remaining 585 acres, in conformity with a development plan prepared by its consultants.

### THE FACTS

Perhaps a clearer understanding of the background can be achieved by setting out the facts in chronological order:

28 April 1969:    County Office of Planning and Zoning releases "1980 Guideplan," a county-wide

|               |                                                                                                                                                                                                                                                      |
|---------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|               | master plan in preliminary form.                                                                                                                                                                                                                      |
| 2 June 1969:  | County Council passes Bill No. 72, directing Planning Board to prepare county-wide zoning map or maps.                                                                                                                                                |
| Summer, 1969: | Planning Board divides county into five sectors and prepares Master Plans and Comprehensive Zoning Maps for each. Nottingham's tract was in Northeast Sector.                                                                                          |
| 14 October 1969: | Public presentation by Planning Board of proposed Plan and Map for Northeast Sector. BM zone; increase in RA zone, r e m a i n d e r R-6 recommended for Nottingham tract.                                                                          |
| 4 November 1969: | Public h e a r i n g before Planning Board on Northeast Sector Map. Nottingham requests RA, BR, BM-CT and R-6 zoning previously described.                                                                                                           |
| February 1970: | Planning Board approves Map for Northeast Sector, granting portions of RA, BM and BR zoning requested by Nottingham.                                                                                                                                 |
| January 1970-May 1970: | Council delays consideration of Maps pending amendment of Z o n i n g Regulations and adoption of procedure for consideration of Maps, by Reso-                                                                                               |

lution No. 3 and Bill No. 42, respectively.

3 August 1970: Passage of Council Bill No. 100, amending Zoning Regulations and of Bill No. 103, setting up procedure for adoption of Maps.

22 September 1970: Planning Board releases revised 1980 Guideplan, Sector Master Plan and Zoning Map for Northeast Sector. Nottingham tract classified DR 16 (residential, 16 dwelling units per acre, a statutory equivalent of RA) ; BR; BM-CT, and DR 5.5 (a statutory equivalent of R-6) ; apartment and business zones larger than those on February 1970 map.

8 October 1970: Public hearing on 1980 Guideplan for County, Sector Master Plan and Comprehensive Z o n i n g Map for Northeast Sector. Nottingham requests CSA district (commercial, supporting area) for part of land zoned BR.

November 1970: Planning Board submits final report and Zoning Maps to County Council. Recommended for Nottingham tract were DR 16, 190 acres; BM-CT, 147 acres; MLR (manufacturing light, restricted), 77

|                    | acres; BR, 18 acres, and DR 5.5, 498 acres. |
|--------------------|---------------------------------------------|
| 18 January 1971:   | Public hearing on Zoning Map for Northeast Sector before County Council. Nottingham renews request for CSA district in part of BR zone. |
| 17 March 1971:     | Second hearing before County Council on Zoning Map for Northeast Sector. For first time, two property owners protest against Nottingham zoning. |
| 24 March 1971:     | Zoning Map for Northeast Sector, placing all of Nottingham tract in DR 5.5 zone, passed by County Council, Council Bill No. 31. |

## THE ISSUES

Nottingham and Rouse say that there are four reasons why the decree of the circuit court should be reversed:

(i) Baltimore County failed to comply with the requirements of Bill No. 103 relating to notice;

(ii) Baltimore County failed to comply with the requirements of Section 303 of the Charter and Bill No. 103 relating to meeting and voting on proposed changes in the Zoning Maps;

(iii) The Zoning Map was not adopted in accordance with a comprehensive plan; and

(iv) The court erred in permitting counsel for Baltimore County to use leading questions

in interrogating members of the County Council.

### (i)

Baltimore County Code (1968, as amended) (the County Code) Title 22, § 22-21 provides, in part:[1]

"Sec. 22-21. Action by county council on adoption of zoning regulations and zoning maps.

"(a) After the county council has received a final report of the planning board recommending adoption of any zoning regulations or zoning maps, the county council shall hold one or more public hearings thereon, giving at least twenty days' notice thereof in at least two newspapers of general circulation in the county. During such twenty-day period, the final report of the planning board with accompanying maps and supporting exhibits, if any, together with any minority report and maps from any dissenting members of the planning board shall be shown and exhibited in the county office building, in each councilmanic district, and at such other public place as the county council may designate for public inspection. After the expiration of such period of notice, and following the public hearing or hearings, the county council may by an ordinance adopt such regulations or maps subject, however, to such changes or amendments therein as the county council may deem appropriate.

"(b) Any change or amendment to be made in a zoning map as proposed by the planning board shall, before final adoption of such map, be brought to further public hearing, advertised and held in the same manner as provided above in subsection (a). If further changes or

---

1. Council Bill No. 103 (1970) amended subsection (a) and added subsections (b) and (c).

amendments to such map shall then be proposed in the county council, a final public hearing, limited to such further changes or amendments, shall be advertised and held in the same manner as provided above before final action on such map is taken by the county council."

In *Swarthmore Co. v. Kaestner*, 258 Md. 517, 531-532, 266 A. 2d 341 (1970), Judge Barnes, speaking for the Court, construed Title 22, § 22-21 of the County Code which, at the time, was not significantly different from that contained in subsection (a):

"It is clear from the language of this section of the . . . [Code] that the County Council is required to have a hearing on the recommendations of the planning board for changes in the zoning regulations or zoning maps, but that after the expiration of such period of notice (20 days) the County Council *may* adopt the recommended regulations or maps but it may also make 'such changes or amendments therein as the county council may deem appropriate.' In short, the County Council need not follow the recommendations of the planning board and need not have any *further or additional hearing* in regard to the changes or amendments the County Council may see fit to make. We have held that the County Council is not required to follow the recommendations of the Planning Board. *Miller v. Abrahams*, 239 Md. 263, 272, 211 A. 2d 309, 314 (1965). We have also indicated that a substantial change may be validly made in a proposed comprehensive zoning map after the public hearing has been held on the originally proposed comprehensive zoning map and no additional notice or hearing was required by statutory language quite similar to that used in Sec. 22-21 of the Baltimore County . . . [Code]. *Hewitt v. County Commis-*

*sioners of Baltimore County,* 220 Md. 48, 56, 151 A. 2d 144, 148 (1959). Indeed, in *Ark Readi-Mix Concrete Corp. v. Smith,* 251 Md. 1, 3, 246 A. 2d 220 (1968) we sustained a change made by the County Council in that case on a proposed comprehensive zoning map *requested on the same day the ordinance was passed,* where there had been no prior discussion, proposal or a request for the change made at the hearing on the proposed comprehensive zoning map and, of course, no notice or prior hearing in regard to the requested change." (Emphasis in original)

Nottingham and Rouse say that the enactment of Council Bill No. 103, less than two weeks after the decision in *Swarthmore v. Kaestner, supra,* was intended to fill the void recognized in that case.

Whether or not this is true, the court below found as a fact, and we agree, that the requirements of subsection (a) were complied with. As regards compliance with subsection (b), the court found that the notice given prior to the second hearing on the Northeast Sector Map clearly showed, by means of a "sticker" placed on the Zoning Map and the entries made on the "log of issues" that the Council proposed to consider the zoning of the Nottingham tract within five specified classifications: DR 5.5, BM-CT, BR, DR 16, and MLR:

"* * * There is no doubt that the sticker applied to the plat showed only that the Council was considering as proposed changes in the Board's recommendations for [the Nottingham] tract . . . five . . . separate zoning classifications for the property in question, and did not delineate separate areas for their application. While it is true that they happen to be the same zoning classifications applied to the specific areas by the Planning Board, the notice made it crystal clear that the Council intended to give

consideration to zoning changes in the area within the listed classifications. * * *

"* * * There is no doubt that the notice actually given informed the property owners and interested members of the public: (a) that it was the intent and purpose of the County Council to give further consideration to the nature of the zoning to be applied to the [Nottingham] tract . . ., and (b) that it would act within those 5 zoning classifications appearing under the heading: 'Proposed County Council Resolution.' There is nothing in the statute requiring notice of a precise suggestion or change by the Council."

The chancellor found apposite a paragraph from the opinion written for the Court by Chief Judge Brune in *Hewitt v. Baltimore County*, 220 Md. 48, 56, 151 A. 2d 144 (1959):

"We do not think the statutory language could be construed as requiring the County Commissioners to state in advance (what they could hardly know) the exact nature of any action which they might take with regard to matters brought to their attention at the contemplated hearing. Indeed, it is difficult to see how (without either prejudgment or prophecy) the notice here given could have been much more explicit or informative than it was. The appellants certainly had no right to assume that the legislative body entrusted with the sole power to enact a comprehensive zoning or rezoning ordinance in Baltimore County was bound to adopt the proposals or recommendations submitted by the Zoning Commissioner."

The short answer is that no "further changes" were proposed at the second public hearing, with the result that the provision for a final hearing contemplated by subsection (b) never became applicable, as the chancel-

lor found. The answer to the contention that the Council must set a final hearing on the specific zoning classification it ultimately adopted is found in the passage from the opinion in *Hewitt,* quoted above.

### (ii)

Nottingham and Rouse next contend that there was a failure to comply with Art. III, § 303 of the County's Charter, and County Code, Title 22, § 22-21 (c).

The Charter provides, in § 303:

> ". . . *Action by Council.* In all of its functions and deliberations, the county council shall act as a body and shall have no power to create standing committees or to delegate any of its functions and duties to a smaller number of its members than the whole."

This was further explained in the Reporter's Note:

> "The manifest purpose of this section is to require the Council to act as a unit in all of its deliberations. The Charter Board believed that a legislative body of only seven members could reasonably be required to transact its business without resort to the use of standing committees."

Title 22, § 22-21 (c) provides:

> "(c) Each change or amendment to be made in a zoning map as proposed by the planning board shall be voted upon individually by the county council, and each vote thereon shall be recorded in the council minutes."

What happened was essentially this. While the Council toured each of the five sectors by bus, it was decided that each councilman would be primarily responsible for zoning in his councilmanic district. After the first Council hearing, it became the councilman's duty to recommend to the Council which issues should be "closed," in

other words to identify those instances in his district where the Planning Board's recommendation should be adopted, thus making unnecessary a second public hearing. It would seem that the Council members interacted as a group, but without formal vote, in the construction of the "log," or list of issues recommended for consideration for the second hearing. By this procedure the number of issues was reduced from some 700 to about 200. On 24 March 1971, the Council acted as a body in closing issues.

As a practical matter, what was really done was to assign to each councilman responsibility for the ascertainment of facts in support of a recommendation which would form a basis for Council action. We find nothing in Art. III, § 303 of the Charter or in Title 22, § 22-21 which proscribes this. The Council acted as a body in adopting Zoning Maps. The vote on the Northeast Sector Map was unanimous.

We think that Judge Menchine had it just about right when he said:

> "More than a century ago in *Board of School Commissioners v. County Commissioners,* 20 Md. 449 [1864], it was said at page 459: 'It would violate the independence of the several departments of Government, and disturb the constitutional distribution of power among them, if the judiciary should intervene and arrest the exercise of wholesome legislative authority upon the ground of repugnance to the Constitution, unless the usurpation of power was clear and indisputable, not merely inferential and argumentative.'

> "In the case of *Fell v. Maryland,* 42 Md. 71 [1875], only of slightly younger vintage, the Court of Appeals rejected a contention that there had been an unlawful delegation of legislative power, and said at page 89: 'Every intendment ought to be made in support of the legisla-

tive enactment, and it is not to be declared invalid, except for the plainest and most conclusive reasons.'

"The ancient principles declared in the above cases are the continuing law of the State. See *Atkinson v. Sapperstein,* 191 Md. 301, 315 [60 A. 2d 737 (1948)]: 'Every presumption favors the validity of a statute.'

"The case of *Savage v. District of Columbia,* 54 A. 2d 562 (Mun. C.A. D.C. [1947]), although factually very different from the subject cases, discussed the delegation of legislative power in terms very descriptive of the course followed by the Council here, saying at page 565: 'It is fundamental, also, that the legislature can not delegate its power to make a law, but it is equally well established that it can * * * delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend.'

"This Court is persuaded that application of these rules of law to the evidence requires rejection of complainants' contention that County Council's actions were products of the unlawful delegation of power.

"There is not the slightest indication in the language of Section 303 of the Charter (or in the Reporter's Notes to the same) that would justify the conclusion that the section intended to prevent the Council as a body from utilizing special knowledge likely to be possessed by individual councilmen with respect to actual or desirable future uses of lands within the district in which he is required by law to reside, or to deny it the benefit of that special knowledge he is likely to possess concerning the views of those home district constituents who are most likely to be affected by zoning in the area.

"While it is clear that the 'final logs' were in

large measure the product of individual councilmanic selection, it has not been shown that any councilman was discouraged or prevented from suggesting change or amendment to any of the Planning Board's recommendations so they might be 'brought to further public hearing.'

"The contentions relating to the inartfully described 'retirements' or 'close outs' of issues requires special comment. It seems to this Court that complainants misconstrue that state of the law as to an important, binding obligation upon the Council in the adoption of comprehensive zoning bills. There is absolutely nothing in the law that requires Council action of any kind in this area. Section 22-21.1 of the Baltimore County Code (Bill 72 [1969], as amended by Bill 42 [1970]) provides imperatively that: 'before March 31, 1971 the *Council shall adopt the entire county-wide map* previously recommended by the Planning Board, with *such revisions as may be made in accordance with Section 22-21.*'

"The so-called 'retirements' or 'close outs' merely operated as adoptions of recommendations of the Planning Board. Such a result followed as a matter of law *unless a majority of the Council* voted to change or amend a particular recommendation. The action of the County Council in dealing with such issues at all, either at or prior to the meeting of March 24, 1971, was wholly unnecessary, and can scarcely be said to be objectionable as a wrongful delegation of power.

"It is urged upon the Court that these Council actions were in fact the sole product of actions by a single councilman. The evidence simply does not warrant, justify or compel such a conclusion. Every councilman participated in visitations to the sites of all or substantially all

of the properties set forth on the 'bus lists'; every councilman thereafter sat in the series of hearings that followed the preparation of the 'final lots', and every councilman participated in and were recorded officially on the final votes by which the relatively small number of changes and amendments to the Planning Board's recommendations were effected. Those changes and amendments themselves tend to demonstrate by their varied nature and effect that their final determination was a product of Council action.

"There is, in short, no showing that rises above conjecture that utilization by the County Council of the skill and judgment of individual councilmen operated to constrain Council action or constituted the performance by an individual of a Council function." (Emphasis supplied in lower court's opinion)

County Code § 22-21.1 referred to in the opinion of the court below, as amended and re-enacted by Council Bill No. 42, passed on 4 May 1970, required the Council to adopt, with such revisions as it might properly make, the county-wide Zoning Map recommended by the Planning Board. This requirement extended only to the Zoning Map, and is not, as Nottingham would seem to imply, at variance with § 523 of the Charter, which requires Council approval of Zoning Maps adopted by the Office of Planning and Zoning. This requirement was met by the passage of Council Bill No. 31.

### (iii)

Nottingham and Rouse next argue that the Zoning Map adopted when Bill No. 31 was passed on 24 March 1971 is invalid because it was not made in accordance with a comprehensive plan. To buttress this argument, they say that County Code, Title 22, § 22-18 requires that ". . . zoning maps and regulations shall be made in accordance with a comprehensive plan." The com-

prehensive plan they equate with the Master Plan provided for elsewhere in the County Code.

Underlying this argument is a common misconception —a confusion between the planning function, the end product of which is the Master Plan, specifically provided for in County Code, Art. II. Planning, §§ 22-12 through 22-17, and the zoning function, covered by Code, Art. III. Zoning, §§ 22-18 through 22-31. Zoning or rezoning in accordance with a comprehensive plan is a legislative function, *Board of County Commissioners of Prince George's County v. Levitt & Sons, Inc.*, 235 Md. 151, 158, 200 A. 2d 670 (1964). There is no requirement that the comprehensive plan adopted by the legislative body must conform to the recommendations of the Master Plan, *Board of County Commissioners for Prince George's County v. Edmonds*, 240 Md. 680, 685, 215 A. 2d 209 (1965) ; *Miller v. Abrahams*, 239 Md. 263, 272, 211 A. 2d 309 (1965) ; 1 Rathkopf, *The Law of Zoning and Planning* Ch. 9, § 1 (3d ed. 1956, 1972). The Court of Appeals of Kentucky drew what we regard as the proper distinction :

> ". . . [A] zoning agency is not bound to follow every detail of a land use plan. As we understand it, such a plan is simply a basic scheme generally outlining planning and zoning objectives in an extensive area. It is in no sense a final plan and is continually subject to modification in the light of actual land use development. It serves as a guide rather than a strait jacket." *Ward v. Knippenberg*, 416 S.W.2d 746, 748 (Ky. 1967).

While it is true that other jurisdictions have by statute required that zoning ordinances be in accordance with the master plan, Haar, *In Accordance with a Comprehensive Plan* 68 Harv. L. Rev. 1154, 1157 (1955), Baltimore County has not. A comprehensive plan is something more than a detailed zoning map, *Hewitt v. Baltimore County, supra,* 220 Md. at 58, and should apply

to a substantial area, be the product of long study, and control land use consistent with the public interest, *Trustees of McDonogh v. Baltimore County,* 221 Md. 550, 561, 158 A. 2d 637 (1960). In other words, an important characteristic of a comprehensive plan is that it be well thought out and give consideration to the common needs of the particular area, *Huff v. Board of Zoning Appeals,* 214 Md. 48, 58-59, 133 A. 2d 83 (1957); *Anne Arundel County v. Ward,* 186 Md. 330, 340, 46 A. 2d 684 (1946). A comprehensive plan is unlikely to have tangible physical existence save as it appears in the zoning ordinance itself, *Angermeier v. Sea Girt,* 27 N. J. 298, 142 A. 2d 624, 630 (1958), and the concept of comprehensiveness may be found in the fact that it zones all, or substantially all, of a political subdivision, that it regulates all uses—good, bad and indifferent, or that it covers all of the usual factors of land utilization: height, area and use, Haar, *supra* at 1158-1167; 1 Metzenbaum, *Law of Zoning* 19 (2d ed. 1955).

We hold, therefore, that the passage of the Zoning Regulations on 3 August 1970 and the adoption of the Zoning Map on 24 March 1971 after the 1980 Guideplan had been presented and considered, could not be challenged as an invalid exercise of legislative authority because there had been no formal adoption of the Master Plan. While County Charter § 523 would seem to provide that the 1980 Guideplan will take effect only when approved by an ordinance of the County Council, whether or not the Guideplan is regarded as a Master Plan, the adoption of a Master Plan is nowhere made a condition precedent to the formulation of the comprehensive plan. The Guideplan was before the Council, and was only one of the elements from which the comprehensive plan was derived.

### (iv)

It is recognized as a general rule that leading questions may be asked a witness on cross-examination, but that one qualification to this rule is that leading questions may not ordinarily be asked of a witness who

demonstrates a bias in favor of the examiner, *Rush v. French,* 1 Ariz. 99, 25 P. 816, 828 (1874) ; 3 Wigmore, *Evidence* § 773, at 165-166 (rev. ed. 1970) ; McCormick, *Law of Evidence* § 6(b), at 10 (1954).

A typical example of this qualification occurred when Nottingham and Rouse called members of the County Council as adverse witnesses by virtue of the provisions of Maryland Code (1957, 1971 Repl. Vol.) Art. 35, § 9. On cross-examination, the court overruled objections taken to leading questions asked by the County solicitor, apparently because the questions only sought to adduce summaries of testimony already given on direct examination, which the County solicitor wished to emphasize. In its ruling from the bench, the court reasoned:

> "It is just that when cross-examination is used, it is simply an impossible task for the other side to pinpoint issues by questions that are not directing the attention of the witness to the particular areas."

As we pointed out in *Williams v. Wheeler,* 252 Md. 75, 79, 249 A. 2d 104 (1969), Art. 35, § 9 mitigates some of the harshness of the common law by permitting a party who calls an adverse witness to interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party. But the statute is to be construed strictly, and does not alter the common law except as explicitly provided, *Mason v. Poulson,* 43 Md. 161, 177 (1875).

We have held that matters concerning the nature and scope of cross-examination are within the sound discretion of the trial court, and that only upon a showing of a prejudicial abuse of that discretion will a ruling be disturbed, *Smith v. Stinson,* 246 Md. 536, 541, 229 A. 2d 67 (1967) ; *Marlow, Infant v. Davis,* 227 Md. 204, 210-211, 176 A. 2d 215 (1961) ; *Wilhelm v. Hadley,* 218 Md. 152, 158, 146 A. 2d 22 (1958).

We feel compelled to apply the teachings of our pre-

decessors which, in analogous situations, have considered the allowance of leading questions and held it to be within the court's discretion, *Stoner v. Devilbiss*, 70 Md. 144, 160-161, 16 A. 440 (1889). In *Frownfelter v. State, Use Carroll Co.*, 66 Md. 80, 88, 5 A. 410 (1886) we held that leading questions ". . . may be properly used for the purpose of bringing the mind of the witness to the point about which it is desired to interrogate him." What we held in *Smith v. Stinson, supra*, 246 Md. at 541, is consistent with the rule of *Stoner* and *Frownfelter*. There, we affirmed the trial court's refusal to allow defense counsel's use of leading questions in the cross-examination of his client, an adverse witness called by the plaintiff. Our holding was not based on the fact that the questions were leading, but instead that the refusal was within the court's discretion in that the questions sought to elicit testimony on cross-examination which was not within the scope of the direct examination.

We find no prejudice or abuse of discretion here.

One final question remains. The County moved to dismiss the appeal on the ground that Nottingham and Rouse had not exhausted their administrative remedies, relying on *Myers v. Chief of Fire Bureau*, 237 Md. 583, 207 A. 2d 467 (1965). Nottingham and Rouse counter with the contention that when there is a constitutional attack upon the general validity of the applicable statute (here, the contention that Bill No. 31, adopting the Zoning Map was not enacted in compliance with a Charter provision requiring the Council to act as a body), failure to exhaust administrative remedies is not available as a defense. We think this point is well taken, *Richmark Realty v. Whittlif*, 226 Md. 273, 280-281, 173 A. 2d 196 (1961); *Schneider v. Pullen*, 198 Md. 64, 68-69, 81 A. 2d 226 (1951); *Kracke v. Weinberg*, 197 Md. 339, 343-344, 79 A. 2d 387 (1951) and *see Williams v. Loyola College*, 257 Md. 316, 336, 263 A. 2d 5 (1970).

*Motion to dismiss denied; decree affirmed, costs to be paid by appellants.*