701 A.2d 879

RICHMARR HOLLY HILLS, INC.

v.

AMERICAN PCS, L.P., et al.

No. 1524, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Oct. 30, 1997.

608

610

612

Rand D. Weinberg (Scott D. Miller and ·Weinberg & Weinberg, on the brief), Frederick, for appellant.

Christine K. McSherry (Whiteford, Taylor & Preston, L.L.P., on the brief), Towson, for appellee, American.

John S. Mathias, County Atty., Frederick, for appellees, Board of Co. Commissioners and Michael C. Thompson, Zoning Administrator.

Argued before MOYLAN and HARRELL, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

HARRELL, Judge.

Richmarr Holly Hills, Inc. (Richmarr), appellant, appeals from a decision of the Circuit Court for Frederick County (Stepler, J.) which affirmed the grant of a special exception by the Frederick County Board of Appeals (the Board). The special exception gave permission to American PCS, L.P. (APC) to erect and operate a 250 foot tall communications tower, with attendant equipment storage structures, on agriculturally-zoned land leased by APC from the American Veterans Association Frederick Post # 2, Inc. (Amvets). Richmarr poses one question for our resolution in this appeal:

> Did the circuit court correctly uphold the Board's decision that the special exception use requested by APC was in harmony with the purpose and intent of the New Market Region Comprehensive Plan?

We respond in the affirmative and, thus, shall affirm the judgment.

## FACTUAL AND REGULATORY CONTEXT

On 21 July 1995, APC, through an agent, filed with the Board a petition for special exception to permit the erection and operation of a 250 foot tall "self-supporting lattice [metal]

tower" as a base station for its wireless communications services network (including mobile and portable telephones, data and message services, and advanced paging services). The tower would have installed on it "up to nine (9) panel antennas (each approximately 54" long by 10" wide by 12" deep) and two (2) microwave dishes (each 2' in diameter)." In addition, two ground-level equipment storage cabinets (each "approximately 6' high by 5' long by 2' deep") were proposed, along with the prospect of a future equipment shelter, at the tower's base. Coaxial antenna cables would connect the equipment cabinets to the antennas. Lighting, as required by the Federal Aviation Administration, would be installed on the tower to alert aircraft to its presence. No personnel would be stationed on-site, and only periodic visits of one or two times per month by maintenance/repair staff were projected. The hours of operation were twenty-four hours a day, seven days a week. A six to ten foot high gated, chain link fence was proposed to secure the physical location of the structures.[1]

As noted *supra*, the site of the proposed use was to be leased by APC from the Amvets.[2] The total Amvets property comprised 26.37± acres of land zoned A–Agricultural. APC's proposed structures were to be sited on a fifty foot by fifty foot area located in the far southeasterly corner of the property (the property is roughly in the shape of a right-angled triangle), adjacent to the existing Interstate Highway 70 (I–70) ramp over Maryland Route 144 (Rte.144) (Exit 59 on I–

---

1. The height of the fence was proposed in one place in the supporting documents filed with the petition as six feet (attachment to Exhibit A7, Deed of Ground Lease Agreement) and as ten feet in another (Exhibit C, Partial Plans and Elevations).

2. The photocopy of the Deed of Ground Lease Agreement between APC and the Amvets filed with the petition, as Exhibit A7, was undated, had the specific financial terms blocked out, and was unexecuted by APC. Representatives of the Amvets, however, had executed it fully. The term of the purported ground lease was for an initial term of five years, with three automatic (absent prior notice to the contrary from APC) five year each renewal terms. Upon termination of the lease, APC was required to remove all of the equipment.

70).[3] Elsewhere on the property, the Amvets had constructed a forty foot by one hundred foot pavilion, restrooms, horse-shoe pits, and playground, which facilities it used or rented for bull roasts, crab feasts, picnics, family and class reunions, outdoor meetings, and other recreational uses. These activities and structures were described as being located on a portion of the property which was "flat ground unsuitable for the cultivation of hay" and "far removed" from the proposed tower location which was to be located on "the grassy farming area which rises to a steep incline." As to the visibility of the proposed tower from surrounding properties, APC asserted in its written Statement of Justification submitted with the special exception petition that

> [t]here will be minimal adverse aesthetic impact in that the tower will be located in a large farm field where the natural contours of the land and the natural tree buffers south, east and west of the proposed site help reduce visual impact to the surrounding area. I–70 is located to the north and there are some existing tree buffer and large embankments to conceal a large portion of the tower from I–70 traffic. To the east, there is a tree buffer and natural contours for a buffer. APC will plant small trees around the exterior of the site to offer additional screening if requested.

Further, APC described the neighborhood surrounding the Amvets' property as follows:

> The neighborhood to be considered in this application generally consists of agricultural and forest properties with residences on large tracts of land. Interstate 70 borders the property to the north; Route 144 to the south.
>
> North: Agricultural and Some Residential Properties.
>
> South: Agricultural and Some Residential Properties.
>
> East: Large Agricultural Tract, Residential Properties and I–70.
>
> West: Agricultural and Some Residential Properties.

---

**3.** A full interchange is planned for this location at some point in the future.

Finally, and of ultimately greatest consequence (whether APC foresaw it so at the time or not), APC aerially asserted that the proposed special exception "will be in harmony with the general purpose and intent of the adopted and approved Master Plan for the New Market region in that adjoining properties to the immediate northeast of our site will permit similar uses by Special Exception . . . and meets . . . the New Market Region Plan zoning requirements."

At the time APC filed its petition for special exception (and at all pertinent times thereafter for purposes of this litigation), the Frederick County Code, at § 1–19–289, permitted a "communications tower" in an Agricultural Zoning District only upon the grant of a special exception.[4] The Zoning Ordinance provided generally for special exceptions, in pertinent part, as follows:

§ 1–19–48. Special exceptions.

\* \* \* \* \* \*

(b) A grant of a special exception is basically a matter of development policy, rather than an appeal based on administrative error or on hardship in a particular case. The board of appeals should consider the relation of the proposed use to the existing and future development patterns. A special exception shall be granted when the board finds that,

(1) *The proposed use is in harmony with* [5] *the purpose and intent of the comprehensive development plan* and of this chapter.

\* \* \* \* \* \*

**4.** All references in this opinion to the Frederick County Code are to those provisions thereof comprising the Zoning Ordinance. Therefore, we shall hereinafter simply refer to each section by its number or refer generally to the Zoning Ordinance.

**5.** Interestingly, § 1–19–4(b) of the Zoning Ordinance defines the term "special exception" in the following manner:

*Special exception:* A grant of a specific use that would not be appropriate generally or without restriction and is based upon a finding, that certain conditions governing special exceptions as de-

(emphasis supplied).

Although the Zoning Ordinance contained other general requirements, as well as specific requirements, relative to special exceptions for a communication tower, this appeal presents no quarrel with the record of the instant case as to its containing evidence meeting those requirements. It is only with regard to § 1–19–48(b)(1) that we are called upon to provide judicial review of the grant of the special exception in this case.

The comprehensive development plan[6] of moment to the case sub judice was last visited in 1990 by the Board of County Commissioners of Frederick County. The 1990 Frederick County Comprehensive Plan replaced a portion of its 1984 predecessor and was expressed in two volumes. Volume I was the 1990 update of the 1984 Countywide Plan. Volume II, containing the more specific land use plans for the eight planning regions into which the County was divided, remained as it had been approved in 1984 when the Board of County Commissioners approved the 1990 version of Volume I. The 1990 Volume I (as did its predecessor) contemplated that the Volume II Regional Plans would be updated at a rate of two regions every four years.

The regional plan for the New Market area, within which the Amvets property was located, was updated and approved

---

tailed in this chapter exist and that the use *conforms* to the comprehensive development plan and is compatible with the existing neighborhood. (emphasis supplied).

**6.** This term is defined in § 1–19–4(b) of the Zoning Ordinance as follows:

*Comprehensive development plan:* A composite of mapped and written text, the purpose of which is to guide the systematic physical development of the county, and is adopted by the board of county commissioners and includes all changes and additions thereto made under the provisions of [Md. Ann.Code] Article 66B. The comprehensive development plan includes a land use plan, a transportation plan, a community facilities plan, a recreation plan and other attendant facility plans.

The Zoning Ordinance elsewhere treated this term as synonymous with the term "master plan."

by the Board of County Commissioners in 1993. Concurrent with the 1993 approval of the New Market Regional Plan, the Board of County Commissioners approved a new zoning map (comprehensive rezoning) for that region which retained the Amvets property in an Agricultural Zoning District, despite the fact that both the 1990 Countywide Plan and the 1993 New Market Regional Plan envisioned the property as someday being devoted to office-research or limited manufacturing uses in the ORI Zoning District.[7] The explanation for the difference between the recommendations of the 1990 Countywide Plan and 1993 New Market Regional Plan on the one hand and the 1993 comprehensive rezoning action on the other can be appreciated to some extent by the following language found in Volume I of the 1990 Countywide Plan at Pages IV–20 and 21:

### THE TIMING OF DEVELOPMENT

While the update of the Regional land use maps will identify a pattern of development for a 20 year time frame, they will not directly address how quickly or slowly that development may take place. Left unregulated by local government, the rate of development is the result of many factors which are difficult to predict for any individual area.

Nevertheless, it is an objective of this Plan not only to recommend the *location* of new development, but *when* that development may most appropriately take place. The location of development will be accomplished by identifying

---

7. The ORI Zone is described in § 1–19–248(e) of the Zoning Ordinance as follows:

The office/research industrial district (ORI) is intended to provide for the development of office, research and limited manufacturing uses in high visibility locations along major highways. Development in this district shall be characterized by an absence of nuisances in a clean and aesthetically attractive setting. This district shall permit limited manufacturing, fabrication or assembly operations which would, by nature of the product, or magnitude of production, be compatible with research, professional or business offices. Commercial uses shall be limited to those which are primarily oriented towards servicing those businesses located within the office/research industrial district.

future land uses on a 20 year land use plan map, while the *timing* of development will be recommended through a 5 year zoning map. In other words, the long range plan will be implemented through limited zoning changes in each Region based on anticipated development needs over the following five years. Areas which are shown for development in the long range but which are not anticipated to be developed or are not appropriate for zoning over the 5 year time frame will be zoned Agricultural. The anticipated development needs for the five year zoning time frame will take into consideration the development potential found in the incorporated municipalities as well as in the County.

The following factors will be considered in developing the recommended 5 year zoning map:

1. County employment projections.

2. The Regional housing projections.

3. The status of water and sewerage facilities.

4. The present condition of roads and programmed improvements to the highway system.

5. The current capacity of schools and programmed school building projects.

6. The current availability of other government facilities and services such as parks and protective services.

7. The current zoning patterns.

\* \* \* \* \* \*

... [C]ommercial and industrial [land uses], are not appropriate to consider utilizing a criteria of population and household projections. Future acreage needs for these types of uses must be based on a combination of employment projections, past industrial absorption trends and policies on industrial and office development. While the County has not to date undertaken a comprehensive industrial land use study, employment projections for the County have been proposed by the Washington Council of Governments. (Emphasis in original).

Thus, although the record in the instant case is not blessed with any portions of the record (such as it may have been) from the 1993 adoption of the comprehensive zoning map or the New Market Regional Plan that would more specifically explain which, if less than all, of the foregoing factors caused the Board of County Commissioners to retain the Amvets property in an Agricultural Zone and not move it into the ORI Zoning District at that time, we assume the reason or reasons lay somewhere within the foregoing explanation of the influencing factors.

The linchpin for what was to become the focus of the instant controversy is the fact that a communications tower is not a use permitted in the ORI Zone, under any circumstances, in the Zoning Ordinance. Thus, the principal question for APC's petition became whether, although its use of the Amvets site was permitted by special exception under the existing Agricultural Zone enjoyed by the property, could it be said to be in harmony with the intent and purpose of the comprehensive development plan (the 1990 Countywide Plan and the 1993 New Market Regional Plan) that recommended a different zone for the property, which zone by definition did not permit the proposed use? Thus were lines drawn and sides taken.

The Board scheduled its hearing on APC's petition for 22 August 1995.[8] The hearing generated a substantial amount of debate, but little of it was about whether the proposed use was in harmony with the purpose and intent of the comprehensive development plan. APC's representative [9] explained, with the

---

**8.** Although the purpose of this hearing, and the reconsideration hearing that followed, was obviously a quasi-judicial quest to adjudicate APC's petition, our review of the transcripts led us to the conclusion that they were conducted more as legislative-type hearings, i.e., the parties did not cross-examine each other's "witnesses." Only the Board members examined the attorneys and/or witnesses after their direct "testimony." We are unable to determine whether this is because the Board's rules or practice purportedly precluded cross-examination by an opponent or the parties simply failed to assert a desire to cross-examine the proponents of opposing assertions.

**9.** The representative was not qualified or offered on the record as possessing any particular expertise.

use of visual aids, how the instant proposal would form a part of its existing and future network (both within and without Frederick County) of towers, poles, and the like in furtherance of the development of its "new technology" in wireless communications. The representative also explained how different users "piggyback" on each other's towers and poles, presumably to avoid duplication of these generally unappealing and substantial structures.[10] Otherwise, he did not stray much in APC's case-in-chief beyond the substance of the information provided at the time of filing the petition, although he did indicate in passing his awareness of the "Industrial Research" recommendation of the "future Comprehensive Plan."

Representatives of the Amvets testified next in support of the petition, candidly acknowledging that they were motivated by the organization standing to benefit from the lease income opportunities as a means to further the group's benevolent programs. The final "witness" in the applicant's case-in-chief at the 22 August hearing was its attorney.[11] She, at least,

---

10. Beauty is said, however, to be in the eye of the beholder. That having been said, if the recent increase in wireless communications tower cases reaching this Court, e.g. *Evans v. Shore Communications*, 112 Md.App. 284, 685 A.2d 454 (1996) and *Sykesville v. West Shore Communications*, 110 Md.App. 300, 677 A.2d 102 (1996), is indicative of a larger number of these structures being erected or planned around Maryland, one could imagine our State will soon look, from the view of the Hubble space telescope, like an angry porcupine.

11. The transcript of the 22 August 1995 hearing did not list APC's attorney as one of the counsel entering their appearance, unlike her colleagues representing the opponents or even the Assistant County Attorney serving as counsel to the Board. She was listed as a witness, though she clearly identified herself as APC's engaged counsel for purposes of the special exception petition. All prospective witnesses were sworn en mass at the beginning of the hearing. It is by no means clear that she testified as a witness, rather than offering argument as attorneys are inclined to do. Even as a witness, no particular field of expertise, such as urban or land planning, was ascribed to or claimed by her. We shall leave to another case a more particularized exploration of whether counsel representing a party in a zoning matter should testify as a fact or opinion witness and, if so, what weight such apparently non-expert opinion testimony should be accorded. *See Cason v. Board of County Comm'rs*, 261 Md. 699, 708, 276 A.2d 661 (1971).

paid some attention on behalf of APC to the relationship of the proposed use and the comprehensive plan. In pertinent and relevant part, she stated:

I would just like to address some of the specific exception, in particular, the requirement that a proposed use be in harmony with the Comprehensive Plan for an area. As I understand it, under the New Market Region Comprehensive Plan, this land is earmarked to be used as either some sort of office research or possibly light industrial, employment center land. I would proffer to the Board that a communications tower at that site would be completely consistent with that sort of land use. I've represented A.P.C. in a number of jurisdictions, Baltimore County, Baltimore City, Howard County and Anne Arundel County among them, and we have placed monopole towers [12] in office and research parks where necessary, particularly because they are less likely to be intrusive in those areas than in residential or highly populated areas. It's a type of use that people are not likely to notice once it's up and that will service an office or a research park particularly well because of the volume of traffic coming to and from that park. It certainly would be in harmony with that kind of use.

The opposition case then commenced. The first speaker was an attorney representing an adjacent property owner.[13] He made this pertinent point.

... [W]e heard testimony earlier that this little triangle [Amvets' property], as well as the property across the street at Meadow Ridge Road, are ... also comprehensively planned for either General Commercial, just a little bit, but mostly office research, industrial uses. Now, office research, industrial uses, if you refer to your Zoning Ordinance, show that—are placed at interchange areas because

---

12. The tower proposed for the Amvets site was not a monopole tower.

13. Neither the attorney nor his client was a participant in the instant appeal before this Court or the circuit court.

interchange areas are gateways to the city of Frederick and present a visual impact for the traveling public. If you read the Zoning Ordinance, it says that office research and limited manufacturing uses are to be held in office research industrial and high visibility locations along major highways. Development in this district, and I'll emphasize, should be characterized by an absence of nuisance in a clean and aesthetically attractive setting. I submit to you that [a] two hundred and fifty (250') foot tower with multiple users, which the current Zoning Ordinance requires in special exceptions to require them to negotiate in good faith with additional users, will be not aesthetically pleasing but, on the contrary, an eyesore to the traveling public, an eyesore to the entryway to Frederick ...

\* \* \* \* \* \*

For a long time, there's been discussions between the City of Frederick and Frederick County about protecting the gateways to Frederick City. There's annexation agreements between the municipalities in order to protect these—these entranceways. This will severely affect those agreements. Just because an applicant meets the specific requirements of a special exception doesn't mean that a special exception needs to be granted. There's also the general requirements ... This neighborhood is developing into an area of residences with a—with an area of Office Research Industrial. And, as I mentioned before, the requirements for Office Research Industrial are completely at odds with this project.

\* \* \* \* \* \*

What I'm saying here is not only is it obnoxious because it's a tower but it's obnoxious to the Comprehensive Plan and in the way that the—the Plan envisioned the use of O.R.I. property and that that nestled up against residentially densely populated or to be densely populated property makes it less appropriate here than it would be in property that is, has been, and will always be agricultural in nature or conservation in nature.

The next opposition witness was Richmarr's attorney. Richmarr was in the process of developing an approved residential community, the Fairways at Holly Hills (comprising 231 single family homes), situated somewhere "southeast of where this proposed tower is to be located." Asserting that his client had "only recently" become aware of the petition, the attorney intimated that, subject to further review, there would be at least an adverse visual impact upon Richmarr's development (and the existing and future residents thereof) from the proposed use. He asked further that the record be kept open or the hearing continued for thirty days. He did not at this time mention, nor adopt by reference, the preceding witness's arguments regarding the comprehensive development plan.

The remaining two opposition witnesses spoke to safety, radio interference, visual impacts on surrounding properties, and adverse property value impacts.[14]

The rebuttal from APC's representative was confined to responses to the opposition's technical arguments. No substantive response, however, was directed to the comprehensive development plan issue.

As the Board members began to discuss the petition among themselves, it was recognized that the major issue was whether the proposed use was in harmony with the purpose and intent of the comprehensive development plan. The Zoning Administrator for Frederick County offered his opinion, in response to a question from the Board Chair, that the earliest the Amvets property could be considered for a rezoning to the ORI Zoning District would be 1998, the next five year cycle following the 1993 concurrent adoption of the New Market Regional Plan and its comprehensive zoning map. The Chair ruminated aloud that multiple "gateway to Frederick" alternatives were proposed in the regional plan and that he wasn't

---

14. One, a real estate broker, briefly commented that he agreed with a prior witness that if the New Market Regional Plan proposed the ORI Zoning District for the Amvets property as part of a gateway to Frederick development concept, a 250 foot tower would not be "a welcoming sign."

certain that the Amvets property would be a particularly good place to develop as a gateway or that allowing a communications tower there would discourage necessarily it being developed as a gateway-type project. Another Board member spoke in favor of the tower not being an impediment to the recommendation of the comprehensive development plan. A motion to approve the petition, with conditions (including site plan review and approval), was adopted unanimously by the three member Board.

At the eleventh hour (and perhaps beyond), three of the opponents filed written requests for reconsideration of the Board's 22 August 1995 oral approval. Only in Richmarr's request, however, was the issue of comprehensive development plan harmony raised. The Board convened a hearing on the reconsideration requests on 24 October 1995.[15]

The first attorney speaking in opposition to the special exception essentially argued that the grant thereof diminished the likelihood that the Amvets property would ever be developed in the ORI Zoning District as a "gateway to Frederick" because a communications tower is by definition not contemplated in the ORI Zone. *A fortiori*, such a tower, he reasoned, was contrary to the purpose and intent of the comprehensive plan.

Richmarr's counsel spoke next. In pertinent part, his explanation for why the special exception should be denied was:

> I say that because of the stated goals and purposes in our Comprehensive Plan. If you look, and I'm reading now from Volume I, duly adopted June 1990, Countywide Comprehensive Plan. On page 2–2, it states the zoning proposals found in the regional plans will be based upon projections of land use and facility needs for the next five (5) years ... plans

---

15. Although the Zoning Administrator, in announcing at the start of the hearing the ground rules for the hearing, indicated that the combatants could provide "testimony on the legal issues that were raised in the letters," no one was sworn as a witness, according to the transcript. It appears to us that most of the "testimony" was again argument of counsel.

for twenty (20) years. And that's what we have on this particular property. We have the "ORI," the Office Research designation, that shows that sometime in the next twenty (20) years, this is to be used for Office Research development. And then what is done by the County Commissioners at each such update is they zone for what they feel to be the need, the demand for facilities, demand for development property for the next five (5) years. And when you have a discrepancy between what is in your Comprehensive Plan for the ultimate development and what they show on the zoning map, what they tell you is they're going to zone it Agricultural. And I would like to refer you now to page 4–20 of the June, 1990 Countywide Comprehensive Plan. Under the heading "Timing of Development," it states, in part, the location of development will be accomplished by identifying future land uses on a twenty (20) year land use plan while the timing of development will be recommended through a five (5) year zoning map. Areas which are shown for development in the long range, but which are not anticipated to be developed or are not appropriate for zoning over the five (5) year time frame will be zoned Agricultural . . . if you compare our Comprehensive Plan maps with our zoning maps, you will see that we have areas designated for development, some of which are now zoned for that development, and the rest of which are now zoned Agricultural. And what that means is we have two (2) types of agriculturally zoned land in Frederick County. We have agriculturally zoned land, which is also planned to be Agricultural for the next twenty (20) years and beyond. And in that type of property, then we'd need to look at what is designated for Agricultural use and we approve what is to be approved in Agricultural uses. But then we have this other ground, which is zoned Agricultural as a holding zone for a future other development use, which is what we have here. And I submit to you when you have that type of agricultural land, you have to look at the Comprehensive Plan and determine if what's being proposed by special exception is consistent with what is going to be done with

that property over the next twenty (20) years. And I would maintain to you that to do otherwise would be putting this Board in, I believe, a precarious position of knowingly creating a future nonconforming use.

\* \* \* \* \* \*

I clearly think that this is the rare case where you've got to look beyond the zoning classification to the Comprehensive Plan because our Zoning Ordinance sends you right there and you look at the purpose and intent of our Comprehensive Plan, not just the map, but you read the words and you look at it and you understand why we zone some property Agricultural, even though we don't intend for it to be Agricultural forever, but we zone it that way to hold it until the time is right to zone it that way we want it to be for eternity, I think you've got—you've got to go where our Ordinance sends you and I think to—to put a use in there that's opposed—that is in conflict with the Comprehensive Plan when we know it's going to be changed at some point, at least according to our Plan, I think you're creating a nonconforming use and I don't think this Board should knowingly create a nonconforming use. Again, I think it's a rare case. I don't think you see many like this. But I certainly believe in this instance, the Comprehensive Plan tell us that it should not go here, it should move to the other side of the road or somewhere where we've got Agricultural land planned to remain Agricultural land.

Thereafter, in colloquies with various Board members, Richmarr's attorney conceded no one could predict when, if ever, the Board of County Commissioners would, in any subsequent five (5) year cycle update of the New Market regional plan and zoning map, retain the ORI Zone recommendation for the Amvets' property or actually zone it. He conceived of those watershed decisional points, however, as being determined by need or demand,[16] presumably as seen through the eyes of

---

16. He offered his belief that the subject property would be rezoned ORI within the 20 year horizon of the 1990 Countywide Plan, i.e. by the year 2010.

whoever occupied the County Commissioners' chairs at the time. He conceded that this objective could be affected by the initiative of the Amvets (or a contract purchaser) [17] to seek rezoning, although the property could be rezoned without the owner's consent as part of a comprehensive rezoning.[18]

When APC's attorney responded, she pointed-out that her client was required to remove the tower and storage structures at the end of the lease, 20 years if it went full term. Thus, she argued that the tower would be no impediment to rezoning and developing the property in the ORI Zoning District at some point inclusive of the planning horizon of the comprehensive development plan.

Her further argument that the existence of the tower, under the approved special exception, would not impede the development of the balance of the Amvets property in the ORI Zone, was as follows:

> So let's hypothetically suppose that some day the property is rezoned and the Amvets convey it and somebody does want to put an office research park there. Well, a communications tower would be perfectly consistent with that use. A communications tower would serve the very people in the facility, the very people going to and from the facility, and would be necessary to the employment center that is proposed under the Comprehensive Master Plan. Zoning ordinances are subject to text amendments. This Zoning Ordinance, as it's written right now, treats communications towers like radio and television towers. Now, wireless communications is a fairly new trend and the need for structures to support the antennas is a fairly new trend and I suspect that either I or one of my counterparts represent-

---

17. The Amvets' representatives who testified at the 22 August 1995 hearing indicated expressly that the organization had no present plans to sell the property.

18. The five (5) year regional plan and comprehensive zoning map update cycle was apparently a new process instituted for the first time in the County starting with the 1993 New Market Regional Plan and comprehensive rezoning, according to Richmarr's attorney.

ing one of the wireless companies is going to propose a comprehensive text amendment to treat these towers the way they ought to be treated and not like radio and television towers because these are far smaller and far less intrusive structures.

\* \* \* \* \* \*

I maintain, as I did at the initial hearing on this, that, in fact, it would, that many towers have been placed in "ORI" or office research type developments in many other jurisdictions and that many jurisdictions direct the communication providers to place their towers there because they are alongside roads where they're not going to be close to residential communities. They are places where people come and go to work and so they expect there to be adequate public facilities to provide for all of their needs at work. And they are not places where people have the expectation of a clear vista that they have in their homes.

She also emphasized that the Board need only conclude whether the use was *in harmony* with the intent and purpose of the plan(s), not whether some mandate in the plan(s) dictated a conforming decision. In support of this "master plan as guide" view, APC's counsel relied on a number of reported Maryland appellate opinions, virtually all of which stated this principle in a rezoning context.[19]

In rebuttal, Richmarr's attorney introduced a new argument in support of his position:

[s]omething I wanted to get before you during [break in tape] but I ran out of time, this is not the first time that this

---

**19.** The only exception was *People's Counsel v. Webster,* 65 Md.App. 694, 501 A.2d 1343 (1986), a case nominally involving a special exception. To the extent that *Webster* held that a master plan's recommendations serve only as a guide in special exception cases, its holding was dependent on the specific language of the Baltimore County Charter provision involved in that case. *Webster,* following *Coffey v. M–NCPPC,* 293 Md. 24, 441 A.2d 1041 (1982) and *Board of County Comm'rs v. Gaster,* 285 Md. 233, 401 A.2d 666 (1979) as it did, also acknowledged that master plan guidelines can be deemed mandatory if an ordinance so provides. *Webster,* 65 Md.App. at 702–03, 501 A.2d 1343.

issue has been before this Board. In 1988, Case B–88–104, application of Barbara Marmet, application was made for a two hundred and seventy-five (275') foot communications tower, which is twenty-five (25')—I think just twenty-five (25') feet more than what's proposed here. Same thing, same issue—property was zoned Agricultural but shown on the Comprehensive Plan for Residential. The tower is not permitted in a Residential use, even though it's permitted in Agricultural use. The Board, in its findings of fact, denied the request and in item "K," stated that they found as a fact that the proposed use would not be in harmony with the purpose and intent of the Comprehensive Plan as the plan for the further development of the area is Low Density Residential and that communication towers are not allowed in Residential Zones. It was exactly the same issue, the only difference being that here, it was Residential, in our case, it's "ORI." But it's an identical issue because the tower is not permitted either in a Residential or "ORI," so I think that if you're going to talk about whether the Comprehensive Plan is a guide, I believe it is. It guides you; it guides everyone. But I think prior cases of this Board and prior interpretations of identical issues for this Board also have to guide this Board's decision. This has been decided before.[20]

Confronted with the more elaborative arguments adduced at the 24 October hearing, one of the Board members changed his mind about approving the petition. He explained:

> I am concerned that we are not looking at what the Comprehensive Plan is telling us to do. Last month, we had up on Braddock Heights an area that is obviously denoted for reserve for Residential and residential uses only. We approved a tower. We said the reason was, the

---

**20.** The transcript of the Board's 24 October 1995 hearing does not reveal that any exhibit was offered or received in evidence in connection with this argument. The record extract submitted to this Court, however, contains a two page photocopy of the Board's Minutes of 24 January 1989 wherein case B–88–104 (Barbara D. Marmet) was denied by the Board (none of the members who voted on the Marmet case remained on the Board in 1995).

out was that the land was zoned Agricultural and was shown on the Comprehensive Plan to be Conservation, so, therefore, it's allowed, so therefore, we got to do it. Even though it's obvious from previous Comprehensive Plans that that area is to be totally residential, is not supposed to have any of this stuff. In this particular case, you have the same thing. It is obvious that the area is to be residential with some Commercial and "ORI" at the intersection of these two (2) main roads. I think that the Zoning Ordinance is clear—we're not supposed to put things like this in these areas.

One of his colleagues expressed renewed conviction about the correctness of the Board's 22 August decision, explaining:

I think it was a good decision and I think that [Richmarr's attorney] has presented a very good argument but I think that we are—we have taken this application by the five (5) year plan, by the five (5) year zoning map, and if everything were such as [Richmarr's attorney] said, then maybe we would take the application by the Comprehensive Plan designation and we do not do that now. I think that this is in harmony with the intent, with the spirit of the Comprehensive Plan. I think that all of our regulations—our land use regulations basically say we are going to have growth but we want to have controlled growth and I think that—I think [Richmarr's attorney's] letter states that this island or this small piece of land was sandwiched between two (2) major highways. This highway has gone from Baltimore and Washington, D.C. across the continental United States to Los Angeles, California ever since I can remember and as far back as the cowboys and Indians, the telephone poles and the transportation lines went together, so I think that this is a very appropriate location for this tower. I'd much rather see it here than in the middle of some prime agricultural land. I wouldn't want to see it beside El Capitan in Yosemite National Park or—or some location like [that]. I think this is an appropriate location and I think that these people with this request have been lead to believe, through the presumption of validity with our special exception use,

that they could put these towers along these lines and I think all of them, basically, are along that route and I think that if we don't want towers along these locations and in these zones, I think we need to do—take another route to change that, either a text amendment or Comprehensive Plan update, but I think we need to follow through with what we've done to this point and I would make a motion to leave our decision stand from the last time.

The Chair shared this sentiment and, in stating why he did so, distinguished the instant case from the Marmet case alluded to by Richmarr in its rebuttal. He stated:

[T]he point was brought up that we had another case that was like it, I don't think the circumstances are exactly alike because we're not talking about a piece of land that's stuck out in the middle of an island with two (2) major roads going by it and all this type of thing. We're not talking about the same exact situation. There are similar parts to it, as far as the zoning part of it, I'll agree with that, but I don't think it's—I don't think it is exactly the same situation and I think we have—we have an option to view it this way and sometimes, the burden goes with us, sometimes it doesn't.

Thus, by a two-one vote, the Board reaffirmed its 22 August approval of the special exception petition. Thereafter, written findings and a decision memorializing the approval were adopted by the Board on 28 November 1995. Relevant findings included:

A. The land in question is zoned Agricultural and consists of 26.37 acres and the Comprehensive Plan map designates this site for Office Research Industrial.

B. The applicant proposes to construct a 250 ft. tall communications tower facility and accessory support structures within a 50' × 50' leased area.

\* \* \* \* \* \*

H. The Board finds that the proposed use is in harmony with the general purpose and intent of the Comprehensive Plan because the land is designated on the current zoning map as an Agricultural Zone; the current owners, the

AMVETS, have indicated that the present agricultural use will remain indefinitely on the property; and the property is located at the intersection of two major highways, and that the staff and Board has regularly in the vast majority of special exceptions interpreted the present zoning indicates the purpose and intent of the Comprehensive Plan.

I. The Board finds the nature and intensity of the operation in connection with the size of the site in relation to it are such that the proposed use would be in harmony with the appropriate and orderly development of the neighborhood upon compliance with conditions of approval set forth by the Board as the facility is located within an Agricultural zoned area and the Comprehensive Plan designates the areas to the south as Conservation, the east is residential, commercial and industrial.

Richmarr alone filed a petition for judicial review with the circuit court. After considering the parties'[21] written memoranda and oral arguments, Judge Stepler filed on 12 August 1996 a well reasoned written Opinion and Order affirming the Board's decision. In reaching this conclusion, the judge reasoned, in pertinent part, as follows:

> As is noted by the BOCC [Board of County Commissioners] in their answering Memorandum of Law, the crux of this case surrounds interpretation of the word "harmony." It is noteworthy that the BOCC, in its answering Memorandum of Law filed on April 19, 1996, stated that, had the Frederick County Code required that the proposed special exception use *"conform* to the comprehensive development plan, the Board of Appeals would have been required to deny this special exception use, since the comprehensive plan calls for office research industrial."

<p style="text-align:center">* * * * * *</p>

---

21. APC and the Board of County Commissioners for Frederick County appeared as appellees in the circuit court and here.

Richmarr would have this Court equate "conformity" with "harmony," as Richmarr speaks of "harmony" in terms of compliance.

This Court first notes that neither [sic] of the parties has provided any authority of how "harmony" should be interpreted. As is stated in the case of *Schultz v. Pritts,* the administrative board is given the duty of judging whether the use "in the particular case is in harmony with the general purpose and intent of the plan." *Schultz v. Pritts,* 291 Md. 1, 11, 432 A.2d 1319 (1981). "If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the board to decide." *Id.* Therefore, this Court must defer to the Board's expertise in defining what uses are in "harmony" with the purpose and intent of the comprehensive plan. Thus, this Court cannot find that the Board's decision is clearly erroneous.

\* \* \* \* \* \*

Richmarr cannot provide this Court with a common law or statutory definition of "harmony" that would exclude the Board's decision in this situation. The Board is vested with the duty to determine whether certain uses are in harmony with the comprehensive plan. Although an exact definition of harmony has never been determined, it is clear that strict compliance with every aspect of the comprehensive plan is not necessary.

\* \* \* \* \* \*

This Court finds that the Board's decision is supported by substantial evidence in the record.

## DISCUSSION

*Background*

■■■ In pertinent governmental land use decisions made in Maryland, save those concerning individual or piecemeal

petitions for rezoning,[22] the weight to be accorded a master plan or comprehensive plan recommendation depends upon the language of the statute, ordinance, or regulation establishing the standards [23] pursuant to which the decision is to be made. The specific types of governmental land use decisions clearly embraced by that principle are rezonings, special exceptions, and subdivision approvals. In such cases, we look first to the words of the applicable statute, ordinance, or regulation to divine what the enabler intended the weight to be accorded by the ultimate decision-maker to a recommendation of the plan. This becomes largely an exercise in statutory interpretation, with its attendant principles of construction. Secondarily, because the field of inquiry involves the relatively complex area of land use, our predecessors have often looked to the nature and purpose of land use and master planning in order to validate and measure any legal conclusion reached regarding the interpretation of the applicable statute, ordinance, or regulation.

To appreciate the role played by master plans in the rezoning process, it is helpful to isolate and consider separately the two processes by which rezoning may occur (piecemeal or individual application by a property owner or its agent and comprehensive zoning map adoption, the former being a quasi-judicial process initiated by private interests leading to a legislative decision, while the latter is quintessentially a legislative function throughout), and also the nature of the zone sought (Euclidean versus floating zone).

### Piecemeal Or Individual Application For Rezoning

 An individual, or piecemeal, application for a Euclidean (see *Euclid v. Ambler*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926)) zoning category in Maryland is dependent for any

---

**22.** As explained time and again in our case law, *infra*, in such cases a Master Plan recommendation may never be deemed more than a guide in making the ultimate decision whether to grant or deny the petition.

**23.** As was observed in ancient times, "cuius regio eius religio" (the ruler of a territory chooses its religion).

hope of success on the applicant satisfying the ultimate decision-maker of the existence of substantial change in the neighborhood of the subject property having occurred since the time of adoption of the most recent comprehensive zoning map, or a mistake having been made in that comprehensive zoning map adoption affecting the zone in which the subject property was placed. Because a master plan does not in and of itself establish either a change or mistake relative to the adoption of the comprehensive zoning map, the master plan recommendation as to the subject property, standing alone, can never satisfy the change-mistake requirement. Thus, the plan recommendation, though it will be a factor generally to be considered, serves merely as a guide or non-binding piece of evidence in the applicant's case.[24]

A slightly different role is normally accorded to a master plan recommendation for a particular zoning category or land use type where the zone sought in an individual application is a floating, versus Euclidean, zone. The change-mistake requirement is inapplicable to floating zone applications. This is due to the nature of floating zones. Floating zones tend to be plan-implementation mechanisms that zoning decision-makers determine best carry out the function of a plan recommendation, and where placing the zone on the subject property is compatible with the surrounding area and the legislatively-declared prerequisites for imposition of the zone. Thus, although a master plan recommendation may assume a weightier role in floating zone cases, it still does not assume the legal weight of being dispositive of an application, unless the creating or enabling statute, ordinance, or regulation makes conformance to its recommendation mandatory.

---

**24.** For example, the Court observed in *Aspen Hill Venture v. Montgomery County*, 265 Md. 303, 314–15, 289 A.2d 303 (1972):

We here note that while a zoning designation on a Master Plan may not support an immediate request for rezoning, as it is a guide for the future, yet, when, as here, it is accompanied by the dynamics of change, we think the designation on the Master Plan becomes most significant.

A typical example of how a master plan functions in a piecemeal floating zone case is *Floyd v. County Council of Prince George's County,* 55 Md.App. 246, 461 A.2d 76 (1983). In *Floyd,* the applicant sought a comprehensive design zone (CDZ), a type of floating zone in the panoply of zones described in the Prince George's County Zoning Ordinance. The particular CDZ sought in that case conformed to some, but not all, of the applicable master plan's recommendations for the subject property and its environs. Specifically, the plan recommended a land use activity that was consistent with the uses permitted in the floating zone sought, but did not envision that use spread over the entire property, i.e. it should be limited to an area within 1,500 feet of the main highway on which the property fronted. The applicant persuaded the County Council, sitting as the District Council for zoning matters, to rezone the entire property as requested, notwithstanding the fact that to do so arguably conflicted with the plan's advice not to extend such a land use beyond a strip of land 1,500 feet east of the property's road frontage (the applicant's proposal depicted development ranging from between 2,400 to 4,800 feet east of the highway).

On appeal, the opponents to the rezoning urged that noncompliance with the spatial element of the master plan map required disapproval of the application. We explained, in pertinent part:

Prince George's County Code, § 27–591(b)(1) requires that:

The proposed plan for development of the Comprehensive Design Zone conforms to an approved General Plan map, Area Master Plan map, or an urban renewal plan map *or is in conformity with the principles described in such plans* in relation to land use, number of dwelling units and intensity of nonresidential buildings, and location.

As the emphasized language indicates, an applicant could fail to comply with *any* adopted map and still satisfy the standard by conforming with the "principles" in these plans, since the requirement is stated in the alternative.

The provisions of § 27–591(b) must be read as flexible standards, so that a large measure of discretion is left with the District Council when reviewing a Comprehensive Design Zone application.

First, the language of the section states specifically that the standards are to be met "to the satisfaction of the District Council." It appears that the Council's intention in enacting the Comprehensive Design Zone provisions was that it have the freedom to decide, partly as policy questions, whether the standards are satisfied.

A review of the standards themselves indicates that they do not admit of precise definition and depend in large part on adopted County plans and policies. The standards are not like height or setback requirements, where compliance, or lack thereof, is readily discernible.

Comprehensive Design Zones are considered "floating zones." In reviewing floating zones, the courts have specifically applied the fairly debatable standard to actions taken by the legislative body. Reviewing courts must not substitute their judgment for that of the zoning agency and must affirm any decision which is supported by substantial evidence and therefore fairly debatable. In *Prince George's County v. Meinenger [Meininger]*, 264 Md. 148, 152, 285 A.2d 649, 651 (1972), it was explained that "substantial evidence" means a little more than a "scintilla of evidence," and in *Eger v. Stone*, 253 Md. 533, 542, 253 A.2d 372, 377 (1969), the "fairly debatable" standard was defined as follows:

> We have made it quite clear that if the issue before the administrative body is "fairly debatable," that is, that its determination involved testimony from which a reasonable man could come to different conclusions, the courts will not substitute their judgment for that of the administrative body....

Courts in Maryland tend to defer to zoning agencies because of their presumed "expertise," and because it is thought best to allow the agency, rather than the reviewing

court, to exercise the "discretion" to grant or deny an application.

This floating zone case is to be judged by the same "substantial evidence" and "fairly debatable" standards as apply in zoning cases generally.

The controlling factor here is whether the Council could find that the Master Plan was only a guide and that the 1,500 foot limitation was adopted as a guideline and not as a mandatory requirement. If the Council were bound by the express provision that only 1,500 feet could be used for conditional employment along Crain Highway, then the finding of substantial compliance might well be found to be arbitrary and contrary to the Master Plan.

However, it is commonly understood, in Maryland and elsewhere, that Master Plans are guides in the zoning process. Master Plan guidelines are mandatory only if an ordinance so provides.

The essential test in this floating-zone case is compatibility, clearly a matter of judgment which should be reserved to the District Council. The cases, starting with *Huff v. Board of Zoning Appeals of Baltimore County,* 214 Md. 48, 133 A.2d 83 (1957), and the Prince George's County Ordinance, in § 27–591(b)(6), provide that a showing of compatibility is a primary requirement. This showing replaces the usual proof of change or mistake; and the requirement likens a floating zone case to a special exception case. Floating zone applications have been reviewed in Prince George's County for years. The zoning agency in a floating zone case must find, just as it does in a special exception case, that compatibility is shown by the applicant's conformance to express ordinance standards.

55 Md.App. at 256–59, 461 A.2d 76 (Emphasis in original; some internal citations deleted). Because the record before the District Council in *Floyd* permitted the Council to discriminate rationally between what parts of the master plan's recommendations to be guided by in determining conformity, the Court upheld the Council's decision to grant the rezoning,

notwithstanding the facial nonconformity to the master plan map delineation.

### Comprehensive Zoning Map Adoption

■■■ Judge Moylan recently compiled comprehensively in *People's Counsel v. Beachwood*, 107 Md.App. 627, 670 A.2d 484, *cert. denied* 342 Md. 472, 677 A.2d 565 (1996) the reasons why the recommendations of a master plan generally can serve only as a guide, and not a mandate, in the adoption or amendment of a comprehensive zoning map, unless the statute, ordinance, or regulation provides otherwise:

> *Howard County v. Dorsey* [292 Md. 351, 438 A.2d 1339 (1982) ], however, was very emphatic that there is no requirement that a comprehensive zoning plan must conform to the recommendations of an applicable master plan.

292 Md. at 363, 438 A.2d 1339. Holding to a similar effect was *Pattey v. Board of County Commissioners*, 271 Md. 352, 360, 317 A.2d 142 (1974):

> As we have said, a master plan is only a guide and is not to be confused with a comprehensive zoning, zoning map, or zoning classification.

In *Montgomery County v. Woodward & Lothrop*, 280 Md. 686, 704, 376 A.2d 483 (1977), Chief Judge Murphy observed:

> Nor is there any requirement, absent a statute, that the map amendment must adhere to the recommendations of the General or Master Plan. Such land use planning documents represent only a basic scheme generally outlining planning and zoning objectives in an extensive area, and are in no sense a final plan; they are continually subject to modification in the light of actual land use development and serve as a guide rather than a strait jacket.

*See also People's Counsel v. Webster*, 65 Md.App. 694, 701–03, 501 A.2d 1343 (1986); *Floyd v. County Council of Prince*

*George's County,* 55 Md.App. 246, 258–59, 461 A.2d 76 (1983).

A definitive statement on this subject is that found in *Nottingham Village v. Baltimore County,* 266 Md. 339, 292 A.2d 680 (1972). In that case, Nottingham Village and The Rouse Company sought a declaratory judgment that the comprehensive zoning promulgated by the Baltimore County Council in 1971 was invalid because of its failure to conform to the Master Plan for Baltimore County. In rejecting the argument made by the developers, Judge Singley stated for the Court of Appeals:

Underlying this argument is a common misconception-a confusion between the planning function, the end product of which is the Master Plan, specifically provided for in County Code, Art. II. Planning, §§ 22–12 through 22–17, and the zoning function, covered by Code, Art. III. Zoning, §§ 22–18 through 22–31. Zoning or rezoning in accordance with a comprehensive plan is a legislative function. *There is no requirement that the comprehensive plan adopted by the legislative body must conform to the recommendations of the Master Plan.*

266 Md. at 354, 292 A.2d 680. (Citations omitted) (Emphasis supplied).

Particularly pertinent to the case now before us was the further observation of the Court of Appeals:

While it is true that other jurisdictions have by statute required that zoning ordinances be in accordance with the master plan, Baltimore County has not.

*Id.* (Citation omitted).

107 Md.App. at 657–58, 670 A.2d 484.

The foregoing would be true of a comprehensive zoning map process regardless of whether the rezoning category being considered for a particular property were a Euclidean [25] or floating zone. This is so because the object of the

---

**25.** The change-mistake requirement attendant to piecemeal rezoning applications for Euclidean zones does not circumscribe a legislative

map adoption process concerns itself with land use factors encompassing much more than a single property, as opposed to a piecemeal application that focuses on the proper zoning of but one property. As was explained by Chief Judge Murphy in *Montgomery County v. Woodward & Lothrop,* 280 Md. 686, 376 A.2d 483 (1977),

> a comprehensive zoning plan is one which applies to or covers a substantial or wide geographical area. The zoning plan must be well thought out, the product of careful consideration and extensive study, and based upon considerations concerning the common needs of the particular area. It must be designed to control and direct the use of land and buildings according to present and planned future conditions, to accomplish as far as possible the most appropriate uses of land consistent with the public interest and the safeguarding of the interests of the individual property owners. Other characteristics of comprehensiveness may be found in the fact that the plan zones all, or substantially all, of a political subdivision, that it regulates all uses, or that it covers all of the usual factors of land utilization: height, area and use.

280 Md. at 702, 376 A.2d 483.

### Special Exceptions [26]

Maryland cases explored long ago what a special exception is and its place in the menu of zoning mechanisms.

"The words 'special exception' are well known in zoning law. They refer to a grant by a zoning administrative body pursuant to the existing provisions of the zoning law and subject to certain guides and standards, of a special use

body's comprehensive zoning map adoption decision, as it does not apply in that process. *See Scull v. Coleman,* 251 Md. 6, 246 A.2d 223 (1968).

**26.** In Maryland, it is generally recognized that "special exception" and "conditional use" are synonymous terms. *Hofmeister v. Frank Realty Co.,* 35 Md.App. 691, 373 A.2d 273 (1977); *but see, Cromwell v. Ward,* 102 Md.App. 691, 699, n. 5, 651 A.2d 424 (1995).

permitted under the provisions of the existing zoning law. Rezoning or reclassification is, of course, a change in the existing law itself, so far as the subject property is concerned. This type of change in the zoning law is governed by quite different provisions of law from those governing the granting of a special exception."

*Cadem v. Nanna*, 243 Md. 536, 543, 221 A.2d 703 (1966) (internal citations omitted).

In *Rockville Fuel and Feed Company v. Board of Appeals of the City of Gaithersburg*, 257 Md. 183, 188, 262 A.2d 499 (1970), the Court said:

In *Montgomery County v. Merlands Club, Inc.*, 202 Md. 279, 287 [96 A.2d 261], we went to some pains to stress that the special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to permit enumerated uses which the legislative body has determined can, *prima facie*, properly be allowed in a specified use district, absent any fact or circumstance in a particular case which would change this presumptive finding.

Moreover, the late Judge Rita C. Davidson, to whom we are indebted for some of the most cogent land use decisions published in our State reports, and while she was a member of our Court, observed:

The conditional use or special exception is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption. The duties given the Board are to judge whether the neighboring properties in the general neighborhood would be adversely affected and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

*Anderson v. Sawyer,* 23 Md.App. 612, 617, 329 A.2d 716 (1974). Since the role of the master plan in the special exception process in Frederick County is at the heart of the instant case, we will defer until later in this opinion further discussion on this point.

### Subdivisions

The Court of Appeals, in two particular cases, included some general observations (as dicta) concerning the role of master plans in the subdivision process, some of which appear to have fostered the type of dispute presented by the case *sub judice.* In *Board of County Commissioners v. Gaster,* 285 Md. 233, 246-47, 401 A.2d 666 (1979), the Court correctly observed that

> some confusion exists relative to the terms planning and zoning, which are not synonymous. Zoning is concerned with the use of property but planning is broader in its concept. 1 E. Yokley, *Zoning Law and Practice* § 1-2 (4th ed.1978) comments:
>
>> Expressing the matter in another way, let us say that zoning is almost exclusively concerned with use regulation, whereas planning is a broader term and indicates the development of a community, not only with respect to the uses of land and buildings, but also with respect to streets, parks, civic beauty, industrial and commercial undertakings,residential developments and such other matters affecting the public convenience and welfare as may be properly embraced within the police power. [*Id.* at 4]
>
> There are three integral parts of adequate land planning, the master plan, zoning, and subdivision regulations. The need for subdivision regulations as a part of that planning is well illustrated by the case here. As it is put in 4 R. Anderson, *American Law of Zoning* § 23.03 (2d ed.1977), "[Z]oning ordinances are not calculated to protect the community from the financial loss which may result from imper-

fect development. Some of these purposes are sought through the imposition of subdivision controls." *Id.* at 47. 4 A. Rathkopf, *The Law of Zoning and Planning* Ch. 71 § 2 (4th ed.1979), gives reasons for subdivision control:

Planning enabling acts and the requirements for plat approval are based upon the realization that homes are no longer generally constructed one at a time for individual owners, resulting in a gradual development which can be controlled by zoning ordinances and local health, building, plumbing, and electrical codes alone. Vacant lots suitable for single homes in already developed communities have all but disappeared. The great increases in population and the unprecedented demand for homes has necessarily resulted in opening up undeveloped land in outlying areas, and the development thereof by large numbers of homes which may be said to be built all at one time. Where such development takes place without restriction other than zoning restrictions, it is the developer who designs the community in respect to the number, length, width, condition, and location of streets. The developer also determines where the newly arrived inhabitants of the community shall reside, without consideration of the necessity for, or existence of, schools, fire protection, parks, playgrounds, and other public facilities. If subdivisions develop too rapidly, or before the community is ready for the added burdens which an increased population imposes, and without adequate control, the result too often is the creation of deteriorating neighborhoods which create a blight upon the community and a drain upon the municipal purse. [*Id.* at 71–6—7.]

*See also* 82 Am.Jur.2d, *Zoning and Planning* § 163 (1976).

By examining in detail in *Gaster* the language of the General Assembly's grant of both zoning and planning powers to Cecil County (a non-charter political subdivision of the State) and then how Cecil County, through its legislative body, the Board of County Commissioners, implemented those powers via local ordinances, the Court was able to reason correctly:

The General Assembly certainly contemplated some change from the previously existing scheme of planning and zoning when it decreed that in the counties covered by Art. 66B approval of the master plan by the local legislative body was required and that subdivision regulations should be adopted by such body. How can a county effectively plan for capital expenditures for roads, schools, sewers, and water facilities if, without regard to preexisting plans, a developer, as proposed here, might place a settlement of 1,200 or more people in the middle of a previously undeveloped area, a settlement which would overtax school facilities and which would necessitate improvement of a road whose reconstruction had not been contemplated before 1990? Planning would be futile in such situations.

In those instances the developer, not the constituted authority of the county, is in control of planning for the future of the county. Surely, this was not contemplated by the General Assembly when relative to the master plan it repeatedly used the words "at specified times as far into the future as is reasonable" and then went on to mandate approval of the master plan by the local legislative body and to require the adoption of subdivision regulations.

It is the county legislative body, the County Commissioners of Cecil County in this instance, which, pursuant to legislative authority, adopted the master plan, the zoning regulations, and the subdivision regulations, a fact which seems to have been overlooked by the trial judge. In the case at bar we see no basic conflict between the zoning regulations and the subdivision regulations. If there were a conflict, the subdivision ordinance in this instance provides that the more restrictive provision shall prevail. Moreover, Art. 66B, § 3.08 specifies that once a master plan has been adopted by the local legislative body "no street . . . shall be constructed or authorized . . . until the location, character, and extent of such development shall have been submitted to and approved by the commission *as consistent with the plan* . . . ." (Emphasis added.) It must be remembered that the board of appeals found the factual conclusions of

the commission to be correct. Thus, it follows that if this proposed subdivision were approved, the streets contemplated in it would be spewing traffic out onto a county road "which has poor vertical and horizontal alignment, poor sight distance, and narrow width [, a] road ... not programmed for reconstruction before 1990." Given the provisions of § 3.08, this in itself was a sufficient basis for the disapproval of the subdivision plat by the commission.

*Id.* at 248–49, 401 A.2d 666.

Unfortunately, in a short concluding paragraph in the final furlong of this opinion, the Court may have oversimplified a perceived relationship between the subdivision process and the zoning mechanism of special exceptions:

> Subdivision regulations *perhaps* have a certain analogy to special exceptions to which the floating zone concept has been likened in this Court's discussions in such cases as *Bigenho v. Montgomery County,* 248 Md. 386, 391, 237 A.2d 53 (1968); *Board v. Turf Valley,* 247 Md. 556, 561–62, 233 A.2d 753 (1967); and *The Chatham Corp. v. Beltram,* 243 Md. 138, 149–50, 220 A.2d 589 (1966). The county here has preordained by its subdivision regulations that one who seeks to cut up a larger tract by creating a subdivision must not disrupt the master plan and that the subdivision must be compatible with that master plan. Likewise, many zoning ordinances specify relative to special exceptions that they shall be granted only if they are compatible with and will not disrupt the master plan.

*Id.* at 249–50, 401 A.2d 666 (emphasis supplied).

Appellant in the instant case seizes on this dicta as supportive of its challenge below and here. Unfortunately, the Court's musing in *Gaster* merely serves to foster the confusion between zoning and planning that it took pains earlier to identify and dispel. Although it is true that normally the legislative body can choose to mandate that a master plan's recommendations can dictate the outcome of most non-rezoning, land use decisions, the foregoing analogy by the Court fails to respect the fundamental differences between

planning actions (such as subdivisions) and zoning actions (in which special exceptions are categorized generally).

Based on the Court's opinion in *Gaster,* the statutes, ordinances, and regulations in play there did not plainly require that, before a proposed subdivision could be approved, it must be found that it was in harmony with the master plan map, text, or both. Rather, through a comprehensive review and synthesis of the zoning and planning grant found in Art. 66B of the Md.Code and the implementation of those powers by Cecil County in its zoning and subdivision regulations, it was determined that a proposed subdivision needed to be found to be "consistent with the plan" (*Id.* at 249, 401 A.2d 666), although there is some suggestion elsewhere in the Court's opinion that the relevant standard may have been "substantial conformance" (*Id.* at 236, 401 A.2d 666).

Less confusion as to the precise regulatory requirement at issue—conformity to the master plan—was presented in the case of *Coffey v. M–NCPPC,* 293 Md. 24, 441 A.2d 1041 (1982).[27] *Coffey* involved Prince George's County, a charter county, that traced its zoning and planning empowerment to Art. 66D of the Md.Code,[28] rather than Art. 66B. Although acknowledging that its decision in *Gaster* was not controlling in *Coffey* because the former involved a non-charter county's zoning and planning powers, the Court believed the logic of *Gaster* was applicable to *Coffey. Id.,* 293 Md. at 26, 441 A.2d 1041. This was so, according to the Court, because the requirements of the respective enabling statutes were similar as to the minimum content of a master plan and both sources authorized the counties to adopt subdivision regulations. *Id.* at 29, 441 A.2d 1041.

---

**27.** Apparently treating it as the obverse of "conformance," the Court also employed the word "noncompliance" to describe the state of the proposed subdivision vis à vis the master plan in *Coffey.* 293 Md. at 24, 441 A.2d 1041. Stated elsewhere in the affirmative in the opinion, and apparently as a synonym for "conformance," the Court also referenced "compliance with the master plan." *Id.* at 30, 441 A.2d 1041.

**28.** This is now Article 28 of the Code.

The land use planning validation given by the Court, justifying why a master plan recommendation can be a mandate in a subdivision case, was:

> As the author points out in 4 R. Anderson, *American Law of Zoning* 2d § 23.20, at 89 (1977), "Subdivision controls are imposed for the purpose of implementing a comprehensive plan for community development. To achieve this end, plats submitted to a planning commission for approval must be examined in relation to the official map and the master plan." Moreover, as the court observed in *Popular Refreshments, Inc. v. Fuller's Milk Bar, etc.*, 85 N.J.Super. 528, 537, 205 A.2d 445 (1964), *petition for certification denied,* 44 N.J. 409, 209 A.2d 143 (1965), "If planning boards had no alternative but to rubber-stamp their approval on every subdivision plat which conformed with the zoning ordinance, there would be little or no reason for their existence. While planning and zoning complement each other and serve certain common objectives, each represents a separate municipal function and neither is a mere rubber-stamp for the other," citing *Levin v. Livingston Tp.*, 35 N.J. 500, 506, 173 A.2d 391 (1961).

In this regard, the language used by the court in *Shoptaugh v. County Com'rs*, 37 Colo.App. 39, 543 P.2d 524 (1975), *cert. denied,* Colo. (1976), is significant here. The court there said:

> "Here, the landowner argues that since the proposed use of the land was a use of right under the zoning laws, the Board had no alternative but to either change the zoning or approve the plat. This argument fails to take into consideration that a subdivider must first meet the zoning regulations and then additionally must comply with the state and county subdivision regulations." 37 Colo.App. at 41–42 [543 P.2d 524].

The process of comprehensive zoning or rezoning is a time-consuming one. It would be virtually impossible to adopt comprehensive rezoning changes calculated to impose the same density requirements as the master plan which would become effective simultaneously with the adoption of

a new master plan that called for lower density development than the preceding plan.

Here we have a regulation duly enacted by the legislative body for Prince George's County which specifies that the planning board shall not approve a subdivision plat not in compliance with the master plan. This subdivision regulation is as much entitled to obedience as any other legislative enactment. The need for the regulation specifying that a subdivision plan must conform to the master plan can be illustrated by comparison to the putting of water in a teacup drop by drop. After a period of time there comes the drop which will cause the cup to overflow. By analogy, developing some of the lots in conformity with the existing zoning will not disrupt the master plan. Concentrated use and development, however, will disrupt it. The legislative body wished to avoid this when it specified that subdivisions must comply with the master plan. Accordingly, the Commission was justified in rejecting Coffey's proposed subdivision for his failure to conform that proposal with the master plan.

293 Md. at 29–31, 441 A.2d 1041.

The essential teachings of *Gaster* and *Coffey*, putting aside their dicta exploring the relationship of zoning and planning, are that the questions needing answers are: What did the General Assembly authorize? What did the locality implement? Reflections on land use and planning principles simply assist in understanding and validating the quest for legislative intent.

With this rather long contextual prologue at an end, we turn to the case at hand.

*Standard of Review*

Judge Salmon, for our Court, in *Lee v. M-NCPPC*, 107 Md.App. 486, 492, 668 A.2d 980, (1995), *cert. denied*, 343 Md. 333, 681 A.2d 69 (1996), succinctly repeated the standards of appellate review applicable to the various aspects of the type of case with which we are presented here:

A court reviewing the decision of an administrative agency is "limited to determining if there is substantial evidence

in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." The standard of review thus depends upon the nature of the agency finding being reviewed. First, the reviewing court must determine whether the agency interpreted and applied the correct principles of law governing the case and no deference is given to a decision based solely on an error of law; the court may substitute its own judgment. "In regards to findings of fact, the [reviewing] court cannot substitute its own judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record." (citations omitted).

*Analysis*

Appellant presents essentially two questions, one purely legal and the other a mixed question of law and fact. The former, to which we shall address ourselves first, is what does § 1–19–48 of the Zoning Ordinance mean by requiring a proposed special exception use to be "in *harmony* with the purpose and intent of the comprehensive development plan" before it may be granted? The latter, dependent on our answer to the first question, involves analyzing whether the evidence before the Board rendered its decision that the proposed communications tower was "in harmony with" the plan fairly debatable.

The County has thoughtfully installed in the general definitional section of its Zoning Ordinance, at § 1–19–4(a)(13), the following:

Throughout this chapter, all words, other than the terms specifically defined herein,[29] have the meaning inferred from their context in this chapter or their ordinarily accept-

---

**29.** "Harmony" is not specifically defined in the Zoning Ordinance.

ed definitions, as defined in Webster's New Collegiate Dictionary, 1974 Edition.[30]

This expression of general legislative intent by the Board of County Commissioners is deserving of our examination, supplanting, at least for now, the usual common law principles of statutory construction.

At the outset, we note that there can be, and indeed there is, no quarrel that whatever the requisite affirmative finding under § 1–19–48(b)(1) may entail, it is mandatory that such be found before a special exception may be granted in Frederick County. This is so because § 1–19–48(e)(2) states, *inter alia,* in its proscription that the Board "shall not grant a special exception unless and until" it has "made a finding of fact that the special exception requested meets the general and specific requirements outlined in this section." The Zoning Ordinance, at § 1–19–4(a)(3), further states that where "shall" is used in the Ordinance it is "always mandatory and not discretionary." *See also Gotach v. Bd. of County Comm'rs,* 60 Md.App. 477, 485–86, 483 A.2d 786 (1984).[31]

*Webster's New Collegiate Dictionary* (7th ed.1974), at 524, defines the word "harmony" as follows:

---

**30.** It is unclear from the record why the 1974 Edition was selected. We speculate that it was the most current version extant at the time of what appears to have been a major codification or recodification of the Zoning Ordinance, based on our reading of the annotations following the various Code sections appearing in the record extract, i.e., Ord. No. 77–1–78, 1–24–77. The invocation of a dictionary definition in aid of statutory interpretation, though common, is fraught with not so obvious complexities, however. *See Rossville Vending v. Comptroller,* 97 Md. App. 305, 316–18, 629 A.2d 1283, *cert. denied* 333 Md. 201, 634 A.2d 62 (1993).

**31.** *Gotach* did not explore the meaning of the requirement that a special exception be "in harmony with the purpose and intent of the ... plan" before it could be approved. The Court expressly did not consider for any purpose the propriety of the Board's finding in that case that the proposed private school would not be in harmony with the plan because the surrounding area was developed with single family residences in the R–3 Zone and the school inferentially would be incompatible with the neighborhood. *Id.,* 60 Md.App. at 481, 486, 483 A.2d 786.

har. mo. ny/ **1** *archaic:* tuneful sound: MELODY **2a:** the combination of simultaneous musical notes in a chord **b:** the structure of music with respect to the composition and progression of chords **c:** the science of the structure, relation, and progression of chords **3a:** pleasing or congruent arrangement of parts <a painting exhibiting of color and line> **b:** CORRESPONDENCE ACCORD <lives in with her neighbors> **c:** internal calm: TRANQUILITY **4a:** an interweaving of different accounts into a single narrative **b:** a systematic arrangement of parallel literary passages (as of the Gospels) for the purpose of showing agreement or harmony[32]

Appellant would have us conclude that none of the senses of "harmony" appearing in *Webster's* is applicable in the context in which it appears in § 1–19–48(b)(1) of the Zoning Ordinance. Instead, appellant directs us to *Black's Law Dictionary* (6th Ed., 1990) where, at 718, "harmony" is described simply as: "The phrase 'in harmony with' is synonymous with 'in agreement, conformity, or accordance with'." Were that the proper analysis, Richmarr's neat argument concludes that, à la the *Gaster* and *Coffey* cases, *supra*, conformity denotes a strict adherence to the purpose and intent of the comprehensive development plan which, in this case, compels denial of the special exception as the plan's proposed and ideal zoning category for the Amvets' property (the office/research industrial indistrict—ORI) does not in its present iteration allow the establishment of a wireless communications tower as a permitted use or by special exception.[33]

---

**32.** For an additional point of reference, there has been no change in the definitional senses of "harmony" between the 1974 Edition and *Merriam–Webster's Collegiate Dictionary* (10th ed.1993) (at 531).

**33.** As a matter of law, however, a lawfully pre-existing communications tower established when the zoning of the site allowed such, as is presently the case, could continue as a legal, nonconforming use if the ORI zone were ever imposed. Even this legal possibility, Richmarr argues, indicates the nonconformity of the instant application with the purpose and intent of the master plan.

We are disinclined to brush past all of *Webster's* senses of "harmony" in order to embrace *Black's*. Uniquely, the Board of County Commissioners has designated *Webster's*, not *Black's*, as a principal lexical and academic source to aid those seeking an understanding of what it intended. Although we might have been inclined ordinarily to look also to *Black's* (*see Rossville Vending, supra,*),[34] the instant regulatory exhortation directs otherwise. With regard to *Webster's* hierarchy of senses of the word "harmony," while Richmarr's argument has merit to the extent that most of the meanings do not fit particularly neatly in the context of § 1–19–48(b)(1) of the Zoning Ordinance, it seems to us that aspects of the origin of the word (from the Greek, meaning "joint"), read together with portions of the 3rd sense (3a: pleasing or congruent arrangement of parts) and 4th sense of the word ("an interweaving of different accounts into a single narrative," "a systematic arrangement of parallel ... passages ... for the purpose of showing agreement ...") give a texture to the word in this context, without too vigorous a semantical shoehorning.

▪ The Zoning Ordinance defines "comprehensive development plan" as "a composite of mapped and written text, the purpose of which is to guide the systematic physical development of the county." Thus, it is expressly a *guide* made from a *composite* of maps and text (the recommendations of neither maps nor text receiving legislative preeminence over the other). Because its approach is also *systematic*, it necessarily must weave the predictions of the text and the maps to project what is conceived to be the locality's ideal for its physical development. It does not internally mandate rigid adherence, for then it would not be a guide. Were the legislative body desirous of externally imposing the plan's recommendations as mandates, eschewing virtually all discretion that could other-

---

**34.** Caution should be exercised in too readily resorting to *Black's* for interpretation of a legislative enactment in any event. It has been observed that *Black's* does not normally supply the ordinary and accepted meaning of words. *See Polychron v. Crum & Forster Ins. Cos.,* 916 F.2d 461, 463 (8th Cir.1990).

wise be vested in itself or subordinate agencies, it seems to us that it could have selected, rather than "in harmony with," more directory language, such as "in conformity with," "consistent with," or "in compliance with." Instead, the legislative body chose a more flexible, malleable standard which gives the Board, in special exception cases, the latitude and freedom to decide, partly as policy questions, whether a particular proposed use would be so inimical or injurious to the announced objectives and goals of the comprehensive development plan so as not to be able to co-exist with the plan's recommendations. Indeed, the proposed use may need to frustrate or preempt achievement of the plan's recommendation, under certain circumstances, before a finding of non-harmony would be justifiable. Admittedly, the standard selected does not lend itself to precise definition (as the circuit court recognized).

This approach makes eminently good sense particularly with regard to special exceptions. The legal nature of a special exception separates it from the subdivision process. That legal status was well explained by the late Judge Davidson, having moved on from this Court to the Court of Appeals, in *Schultz v. Pritts,* 291 Md. 1, 432 A.2d 1319 (1981):

The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption. The duties given the Board are to judge whether the neighboring properties in the general neighborhood would be adversely affected *and whether the use in the particular case is in harmony with the general purpose and intent of the plan.*

291 Md. at 11, 432 A.2d 1319 (Emphasis in original deleted; emphasis supplied). It is this presumption, albeit a rebuttable and conditional one, of validity and correctness as part of the

comprehensive zoning plan enjoyed by special exceptions that distinguishes them as zoning mechanisms from the subdivision process addressed in *Gaster* and *Coffey*.

In viewing the legislative process wherein it is decided whether to designate within a zoning ordinance certain uses as permitted uses (sometimes referred to colloquially as uses permitted as of "right") and others as special exceptions or conditional uses, the Court in *Schultz v. Pritts* recognized that the legislative body necessarily engages in a balancing process. *Id.* at 20–21, 432 A.2d 1319. It is compatible with this legislative balancing process, and the companion election to delegate to a subordinate administrative body the responsibility to adjudicate and render a final decision whether the specified conditions are met in a given special exception application, to construe the delegation of authority so as to permit the body to exercise a commensurate discretion in its decision-making, absent language indicating a contrary legislative intent. It is not coincidental, we think, that reported Maryland cases construing the use of a legislatively-designated criterion of "conformity" (denoting a mandate) to a master plan's recommendation involve subdivision cases [35], while those employing the standard of "harmony" (denoting greater discretion) with the master plan arose in special exceptions.[36]

Absent clearer direction from the pertinent legislative body, the judicial response to the legislative choice of zoning terms of art, such as "in harmony with the" master plan, has often been measured to treat these terms as flexible and elastic phrases or words. This indulges the notion that the legislature, particularly in the specialized area of special exceptions/conditional uses, intended the inferior body to have some latitude in the discharge of its duties on a case-by-case basis. An example of this can be found in *Neuman v. City of*

---

**35.** *See Coffey, supra; Gaster, supra; Krieger v. Planning Commission of Howard County*, 224 Md. 320, 323, 167 A.2d 885 (1961).

**36.** *See Schultz, supra; Rockville Fuel & Feed v. Bd. of Appeals*, 257 Md. 183, 191, 262 A.2d 499 (1970); *Crowther, Inc. v. Johnson*, 225 Md. 379, 383, 170 A.2d 768 (1961).

*Baltimore,* 251 Md. 92, 98–99, 246 A.2d 583 (1968), where, in the context of a special exception case, the phrase "vicinity of the premises" was employed in the legislative enactment to circumscribe the universe for measurement of the need for the pertinent doctor's office. The Court recognized that construing the definition of the meaning of that language required a flexible, elastic, and relative approach. *Id. See also Woodlawn Area Citizens Ass'n v. Board,* 241 Md. 187, 216 A.2d 149 (definition of "neighborhood" as employed in determining sufficiency of evidence in a change/mistake rezoning application was a flexible and relative term which may vary from case to case).

The words employed by the Frederick County Board of County Commissioners in the instant case do not convince us that it intended that the Board have no discretion in construing whether a special exception application was in harmony with the purpose and intent of the comprehensive development plan. We turn now to an analysis of whether the Board's decision on that score in the instant case was a fairly debatable one on this record.

▮▮▮▮ *Schultz v. Pritts* provides us with a reverse prism point of view to approach that analysis:

> If the evidence makes the question of harm or disturbance or *the question of the disruption of the harmony of the comprehensive plan of zoning* fairly debatable, the matter is one for the Board to decide. But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of *factors causing disharmony to the operation of the comprehensive plan,* a denial of an application for a special exception use is arbitrary, capricious, and illegal.

291 Md. at 11, 432 A.2d 1319 (Internal citations omitted; emphasis supplied).[37] Employing this point of view also in our survey of the record before the Board and deferring to the

---

37. Judge Smith, who authored coincidentally both *Coffey* and *Gaster,* in his dissent in *Schultz,* does not seem to quarrel with this approach. *Schultz,* 291 Md. at 26–27, 432 A.2d 1319 (quoting from *Rockville Fuel & Feed v. Bd. of Appeals,* 257 Md. 183, 191, 262 A.2d 499 (1970)).

local expertise of the Board in making such judgments, we conclude that a reasoning mind could have determined, based on the evidence, that APC's special exception application was in harmony (or not in disharmony) with the intent and purposes of the plan. We do not mean to say that, on the same record, the Board could not have concluded to the contrary for equally good or better reasons; that is simply the nature of a matter being fairly debatable. We explain.

The 1990 Countywide Plan explicitly does not guarantee that the recommended long range plan recommendations (the ORI zone in the case of the Amvets site) will materialize during any discrete 5 year comprehensive rezoning cycle of the 20 year horizon adopted by the Plan. Indeed, as the 1993 New Market Regional Plan and comprehensive rezoning self-evidently indicated, whatever the conditions may be that need to ripen before the Amvets property would be suitable for placement in the ORI zone, they had not occurred as of 1993. The text of the 1990 Plan, *supra* at 7–8, suggests the complex matrix of threshold considerations that might need to be pondered before commercial or industrial rezonings could occur. Some of those precursors, such as a "comprehensive industrial land needs study," had not commenced, nor were they projected to commence, at that time. Thus, even if one assumes, as Richmarr argues, that the Agricultural zoning currently enjoyed by the Amvets property was but a "holding zone," until the land use tumblers fall into place opening up the possibility of a recategorization to the ORI zone, it is wholly unpredictable when, if ever, that may occur. This state of uncertitude of the Plan's recommendation was considered by the Board.

Some skepticism may have been in order as to whether the Plan's "gateway to Frederick" underpinning for the ORI-type development envisioned on the Amvets site was viable. Noting that the Plan contemplated multiple "gateway" developments at other locations as well, a Board member ruminated that the site of the subject property, perched like an elevated island between two major roads, was somewhat less likely of fruition as such a "gateway" development than its brethren.

As to whether the approval and establishment of a 250 foot tall communications tower on a fifty foot by fifty foot portion of the southeasterly tip of the 26.37± acre Amvets property would inhibit ultimately rezoning all or a portion of the remaining property to the ORI zone (and having that area develop as an office/research industrial park), the Board was entitled, as it apparently did, to credit and be persuaded by APC's arguments that the two concepts were compatible. APC asserted that many likely tenants of an ORI-type development typically utilize and rely on wireless communications such as the proposed tower would facilitate. Because the maximum length of APC's lease of the portion of the Amvets property involved was twenty years, APC also pointed out that, even if its tower would be an impediment to appropriate ORI-type development, the tower would be removed at a point in time roughly coincident with the furthermost horizon of the Plan.

There was no direct evidence that the remainder of the 26.37± acres would be rendered unsuitable for ORI-type development. To the contrary, the location of the proposed tower was described as topographically and by distance "far removed" from the "flat ground" where the Amvets had installed their recreational structures and uses. It is our view that the record before the Board was adequate to support its conclusion that APC's tower would be in harmony with the purpose and intent of the comprehensive development plan.

Richmarr's final assertion is that the Board's grant of APC's special exception application was inconsistent with its predecessor's decision in 1988 to deny the Marmet application, the facts of which were asserted by Richmarr to be "almost identical to the instant case." The Board chair in the instant case, at the 24 October 1995 meeting, addressed the Marmet case. He observed that the two cases, although they shared some factual similarities, were distinguishable. His assessment appears accurate.

The Marmet property had been zoned Agricultural, but recommended in the Plan for Low Density Residential. The

275 foot tall radio tower proposed for the Marmet property, although approvable in the existing Agricultural zone, would have been a prohibited use in the recommended residential zone. Unlike the neighborhood of the Amvets property in the instant case, the majority of the surrounding properties in the neighborhood of the Marmet site were found by the Board to have been developed with residential housing. The properties surrounding the Amvets site presented not only a lesser degree of actual development (Richmarr's "Fairways at Holly Hills" subdivision notwithstanding), but varied in kind as to actual zoning (mostly agricultural, with some residential) from that apparently presented in the Marmet case. Moreover, the relative topographical and visual relationships between the Marmet and Amvets sites and their respective neighborhoods, and their locations along adjacent roadways, seemed to be materially distinguishable. Because this record is somewhat less than precise in permitting us to explain a nicer distinction on these points, we opt to defer to the local body's far greater familiarity with its own backyard in evaluating such matters. Suffice it to say, we are able to discern from the record that the Board's decision was fairly debatable.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY AP-PELLANT.